## BROWN *v.* UNITED STATES.

No. 43. Argued April 4, 1957.—Restored to the calendar for reargument June 10, 1957.—Reargued October 22, 1957.—Decided March 31, 1958.

*George W. Crockett, Jr.* argued the cause and filed the briefs for petitioner.

*Ralph S. Spritzer* argued the cause for the United States. On the briefs were *Solicitor General Rankin, Warren Olney, III,* then Assistant Attorney General, and

*Beatrice Rosenberg. Mr. Spritzer* was also with them on the brief on the reargument.

Mr. Justice Frankfurter delivered the opinion of the Court.

This is a proceeding of summary disposition, under Rule 42 (a) of the Federal Rules of Criminal Procedure,[1] of a finding of criminal contempt committed in the actual presence of the court, the power to punish which is given by 18 U. S. C. § 401.[2]  The proceeding grew out of a suit for denaturalization brought against petitioner pursuant to § 340 (a) of the Immigration and Nationality Act of 1952, 66 Stat. 260, as amended, 8 U. S. C. (Supp. IV) § 1451 (a).  The complaint in the denaturalization suit charged that petitioner had fraudulently procured citizenship in 1946 by falsely swearing that she was attached to the principles of the Constitution, and that she was not and had not been for ten years preceding opposed to organized government or a member of or affiliated with the Communist Party or any organization teaching opposition to organized government, whereas in fact petitioner had been, from 1933 to 1937, a member of the Communist Party and the Young Communist League, both organizations advocating the overthrow of the Government of the United States by force and violence.

---

[1] "A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court.  The order of contempt shall recite the facts and shall be signed by the judge and entered of record."

[2] "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

"(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

"(2) Misbehavior of any of its officers in their official transactions;

"(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

At the trial in the denaturalization proceeding, petitioner was called as an adverse witness by the Government under Rule 43 (b) of the Federal Rules of Civil Procedure. Petitioner admitted that she had once been a member of the Young Communist League, but denied that she had belonged to the Communist Party in the period before 1946. She refused to answer questions about activities and associations that were unlimited in time or directed to the period after 1946 on the ground that her answers might tend to incriminate her, and the District Court sustained the claim of privilege. At the close of the Government's examination, petitioner's counsel stated that, "I won't cross-examine the witness at this point. I will put her on on direct." [3]

Thereafter petitioner took the stand as a witness in her own behalf. She comprehensively reaffirmed the truth of the statements made at the time of her naturalization, and, although she admitted membership in the Young Communist League from about 1930, claimed that she had resigned in 1935 and had not engaged in any Communist activities from 1935 until her naturalization in 1946. Not content to rest there, petitioner went on to testify that she had never taught or advocated the overthrow of the existing government or belonged to any organization that did so advocate, that she believed in fighting for this country and would take up arms in its defense in event of hostilities with Soviet Russia, and that she was attached to the principles of the Constitution and the good order and happiness of the United States. [4] This

---

[3] Counsel for petitioner in this Court did not represent her in the trial court.

[4] "Q. Are you willing to take up arms in defense of this country, in the event of any hostility between the United States and Russia?
"A. Yes.
"Q. Regardless of whatever the reason may be for any hostility

testimony was directed to petitioner's present disposition towards the United States, and was not limited to the period before 1946.

between the government of the United States and the Government of Russia?

"A. That is correct.

"Q. In Question 28 you were asked: 'Are you a believer in anarchy, or the unlawful damage, injury or destruction of property, or of sabotage'? And you answered 'No.'

"Was that a true answer to that question?

"A. That was a true answer.

"Q. You say it was not only a true answer at the time you filed the petition, July 16, 1946, and is that the true answer today?

"A. It is true. It was a perfectly true answer to that question. I never believed in overthrowing anything. I believe in fighting for this country. I like this country. I never told anybody I didn't.

"Q. Did you ever teach or advocate anarchy or overthrow of the existing government in this country?

"A. Teach?

"Q. Did you ever teach the idea that we ought to overthrow the government of the United States?

"A. No, I never did.

"Q. Did you ever advocate that?

"A. No.

"Q. Did you ever say that we should?

"A. No, I never did.

"Q. To your knowledge, did you ever belong to any organization that taught or advocated anarchy or the overthrow of the existing government of this country?

"A. No. As much as I know, I didn't belong, to destroy the country. I believe in helping the country, and helping the people. That was my life of living, not destroying the things that the people put up.

"Q. Are you attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States?

"A. That, I am.

"Q. What do you understand by that? What do you understand by those words 'attached to the principles of the Constitution'?

"A. The way I understand this, when my country needs me, I fight for it and do what is right among the people."

On cross-examination the Government immediately put to petitioner the question, "Are you now or have you ever been a member of the Communist Party of the United States?" It also asked numerous other questions relating to Communist activities since 1946 that petitioner had successfully refused to answer when first examined. Petitioner again refused to answer, claiming the privilege against self-incrimination. The District Court ruled that by taking the stand in her own defense petitioner had abandoned the privilege, and directed her to answer. However, petitioner persisted in her refusal to answer any questions directed towards establishing that she had been a Communist since 1946. For this she was cast in contempt of court and sentenced to imprisonment for six months. The judgment of conviction was affirmed by the Court of Appeals. 234 F. 2d 140. Deeming the record to raise important questions regarding the scope of the privilege against self-incrimination and the power of a federal court to make summary disposition of a charge of criminal contempt, we brought the case here. 352 U. S. 908. Argument was had in the 1956 Term and the case set down for reargument in the present Term. 354 U. S. 907.

The conduct for which petitioner was found guilty of contempt was her sustained disobedience of the court's direction to answer pertinent questions on cross-examination after her claim of the privilege against self-incrimination had been overruled. On the first argument in this Court, petitioner stood on the validity of her claim of privilege as the essential ground for reversal here of the judgment of the Court of Appeals. It was taken for granted by petitioner no less than by the Government that for a party insistently to block relevant inquiry on cross-examination subjects him to punishment for contempt in the exercise of the power vested in the federal courts throughout our history. Act of Sept. 24, 1789,

§ 17, 1 Stat. 83; Act of Mar. 2, 1831, 4 Stat. 487–488; R. S. § 725; Judicial Code, 1911, § 268, 36 Stat. 1163; 18 U. S. C. § 401.

On reargument, both sides, responsive to a suggestion from the bench, discussed the relevance of *Ex parte Hudgings,* 249 U. S. 378, to the present situation. That case, followed in *In re Michael,* 326 U. S. 224, held that for perjury alone a witness may not be summarily punished for contempt. The essence of the holding in those cases was that perjury is a specifically defined offense, subject to prosecution under all the safeguards of the Fifth and Sixth Amendments, and that the truth or falsity of a witness' testimony ought not be left to a judge's unaided determination in the midst of trial. Perjury is one thing; testimonial recalcitrance another. He who offers himself as a witness is not freed from the duty to testify. The court (except insofar as it is constitutionally limited), not a voluntary witness, defines the testimonial duty. See Judge Learned Hand in *United States* v. *Appel,* 211 F. 495.

Such has been the unquestioned law in the federal judicial system time out of mind. It has been acted upon in the lower courts and this Court. Whatever differences the potentially drastic power of courts to punish for contempt may have evoked, a doubt has never been uttered that stubborn disobedience of the duty to answer relevant inquiries in a judicial proceeding brings into force the power of the federal courts to punish for contempt. Trial courts no doubt must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice. It is no less important for this Court to use self-restraint in the exercise of its ultimate power to find that a trial court has gone beyond the area in which it can properly punish for contempt. We are not justified in sliding from mere disagreement with the way in which a trial court has dealt with a particular

matter, such as petitioner's conduct in the present case, into a condemnation of the court's action as an abuse of discretion.

We thus reach the constitutional issue.

Petitioner contends that by taking the stand and testifying in her own behalf she did not forego the right to invoke on cross-examination the privilege against self-incrimination regarding matters made relevant by her direct examination. She relies on decisions holding that witnesses in civil proceedings and before congressional committees do not waive the privilege by denials and partial disclosures, but only by testimony that itself incriminates. More particularly, petitioner's reliance is on *Arndstein* v. *McCarthy,* 254 U. S. 71; *McCarthy* v. *Arndstein,* 262 U. S. 355, 266 U. S. 34. In that litigation a witness called before special commissioners in bankruptcy proceedings filed schedules of his assets and liabilities and made certain disclosures in respect to his financial condition, but refused to answer numerous questions on the ground that to do so might incriminate him. This Court held that the witness' refusal did not constitute contempt; that since the evidence furnished "did not amount to an admission of guilt or furnish clear proof of crime . . . ," the privilege had not been abandoned and the witness was entitled to "stop short" when further testimony "might tend to incriminate him." 254 U. S., at 72; 262 U. S., at 358. The testimony of petitioner in the present case admittedly did not amount to "an admission of guilt or furnish clear proof of crime," but was, on the contrary, a denial of any activities that might provide a basis for prosecution.

Our problem is illumined by the situation of a defendant in a criminal case. If he takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of

relevant cross-examination. "[H]e has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts." *Fitzpatrick* v. *United States,* 178 U. S. 304, 315; and see *Reagan* v. *United States,* 157 U. S. 301, 304–305. The reasoning of these cases applies to a witness in any proceeding who voluntarily takes the stand and offers testimony in his own behalf. It is reasoning that controls the result in the case before us.

A witness who is compelled to testify, as in the *Arndstein* type of case, has no occasion to invoke the privilege against self-incrimination until testimony sought to be elicited will in fact tend to incriminate. It would indeed be irrelevant for him to do so. If he is to have the benefit of the privilege at all, and not be confronted with the argument that he has waived a right even before he could have invoked it, he must be able to raise a bar at the point in his testimony when his immunity becomes operative. A witness thus permitted to withdraw from the cross-fire of interrogation before the reliability of his testimony has been fully tested may on occasion have succeeded in putting before the trier of fact a one-sided account of the matters in dispute. This is an argumentative curtailment of the normal right of cross-examination out of regard for the fair claims of the constitutional protection against compulsory self-incrimination.

On the other hand, when a witness voluntarily testifies, the privilege against self-incrimination is amply respected without need of accepting testimony freed from the antiseptic test of the adversary process. The witness himself, certainly if he is a party, determines the area of disclosure and therefore of inquiry. Such a witness has the choice, after weighing the advantage of the privilege against self-incrimination against the advantage of putting forward his version of the facts and his reliability as a witness, not to testify at all. He cannot reasonably

claim that the Fifth Amendment gives him not only this choice but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute. It would make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell. "[T]here is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." *Walder* v. *United States,* 347 U. S. 62, 65. The interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.[5] Petitioner, as a party to the suit, was a voluntary witness. She could not take the stand to testify in her own behalf and also claim the right to be free from cross-examination on matters raised by her own testimony on direct examination.

Petitioner claims that the District Court found that she had waived the privilege merely by taking the stand, whereas the Court of Appeals affirmed her conviction on the ground that she had taken the stand and testified as she did. Petitioner argues from this distinction that her conviction has been affirmed on a charge not made in the District Court. She also suggests that the reason given by the District Court for finding a waiver misled her as to the actual legal question involved, and that but for the assertions of the court she might have withdrawn her opposition to the cross-examination and answered the questions put by the Government.

---

[5] Striking the witness' testimony, or relying on the trier of fact to take into account the obvious unfairness of allowing the witness to escape cross-examination, must often in practice be poor substitutes for a positive showing under searching cross-examination that the testimony is in fact false.

The record does not fairly support the statement that the District Court found a waiver simply in the act of taking the stand. After petitioner had testified on direct examination, the court ruled that "the defendant having taken the stand in her own defense, has waived the right to invoke the Fifth Amendment . . . ." In view of the circumstances surrounding this ruling and the testimony that preceded it, it is reasonably clear that the court meant to convey by "having taken the stand in her own defense" what she said on the stand, not merely that she physically took the stand. As the District Court expressly stated in its opinion finding petitioner in contempt, it had cautioned her that "she had waived the right to claim any privileges under the Fifth Amendment, by reason of having testified as a witness in her own behalf." The reason for abandonment of the privilege, as thus expressed by the court, is wholly consistent with the reason given by the Court of Appeals in affirming the conviction, and with our ground for upholding the judgment of the Court of Appeals. Nice questions in interpreting the record to ascertain whether a trial court has discharged its duty of appropriately framing the legal issues in a litigation, or at least not misframing them to the detrimental reliance of one of the parties, are not here presented. Taken in context, the ruling of the District Court conveyed a correct statement of the law, and adequately informed petitioner that by her direct testimony she had opened herself to cross-examination on the matters relevantly raised by that testimony. The judgment is

*Affirmed.*

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS concur, dissenting.

This is another decision by this Court eroding the constitutional privilege against self-incrimination. See,

*e. g., Feldman* v. *United States,* 322 U. S. 487; *Rogers* v. *United States,* 340 U. S. 367.

The questions which petitioner refused to answer undoubtedly called for responses which might have tended to incriminate her. Nevertheless, the Court holds that she can be imprisoned for contempt on the ground that a defendant in a civil action who voluntarily takes the stand to testify waives his privilege against self-incrimination to the extent of relevant cross-examination. Thus in substance the majority has extended the rule heretofore applied in criminal prosecutions to civil proceedings. I think this further encroachment on the privilege is unwarranted. I would reverse the petitioner's conviction on the basis of the general rule stated in *Arndstein* v. *McCarthy,* 254 U. S. 71, 262 U. S. 355, 266 U. S. 34, that a witness in a civil case does not forfeit the right to claim his privilege unless he makes disclosures which amount to "an actual admission of guilt or incriminating facts." 262 U. S., at 359.* Petitioner concededly made no such disclosures.

In my judgment the rule of waiver now applied in criminal cases, although long accepted, is itself debatable and should not be carried over to any new area absent the most compelling justification. By likening the position of a defendant who voluntarily takes the stand in a civil case to that of an accused testifying on his own behalf in a criminal prosecution the majority unfortunately fails to give due consideration to material differences between the two situations. For example failure of a criminal defendant to take the stand may not be made the subject of adverse comment by prosecutor or judge,

---

*As I construe the holding in *Arndstein* v. *McCarthy,* it is based on the simple ground that once a witness has incriminated himself subsequent inquiries concerning the same offense cannot harm him any further and the reason for the privilege disappears. But cf. *Rogers* v. *United States,* 340 U. S. 367.

nor may it lawfully support an inference of guilt. 18 U. S. C. § 3481; *Wilson* v. *United States,* 149 U. S. 60. On the other hand the failure of a party in a civil action to testify may be freely commented on by his adversary and the trier of fact may draw such inferences from the abstention as he sees fit on the issues in the case. *Bilokumsky* v. *Tod,* 263 U. S. 149, 153–154. Thus to apply the criminal rule of waiver to a civil proceeding may place a defendant in a substantial dilemma. If he testifies voluntarily he can be compelled to give incriminating evidence against himself; but, unlike a defendant in a criminal case, if he remains off the stand his silence can be used against him as "evidence of the most persuasive character." *Bilokumsky* v. *Tod, supra,* at 154.

The Court brushes aside this dilemma by assuming that a civil defendant can control the scope of his waiver when he voluntarily takes the stand because he "determines the area of disclosure and therefore of inquiry." I do not believe this assumption is correct. While it is true that a party can determine the area of his own disclosures on direct examination, the scope of permissible cross-examination is not restricted to the matters raised on direct but may include other and quite different matters if they will aid the court or jury to appraise the credibility of the witness and the probative value of his testimony. Such questions, which may range over a broad area and refer to matters collateral to the main issues, cannot be foreclosed by the witness and often cannot even be anticipated by him. See, *e. g., Radio Cab, Inc.,* v. *Houser,* 76 U. S. App. D. C. 35, 128 F. 2d 604; *Atkinson* v. *Atchison, Topeka & Santa Fe R. Co.,* 197 F. 2d 244. See also *Powers* v. *United States,* 223 U. S. 303, 314–316.

Furthermore a party to a civil action, unlike the defendant in a criminal case, may be compelled by his adversary to take the stand and thus forced into a situa-

tion (as illustrated by this case) where he must claim the privilege or incriminate himself. By claiming his privilege he may well prejudice his case for reasons wholly unrelated to its merits. In order to mitigate this damage he may feel great compulsion, either on cross-examination by his own counsel or by taking the stand later on his own behalf, to dispel some of the impression created by the claim of privilege. But this he cannot do under the Court's holding without thereby forfeiting his constitutional privilege.

The reason offered by the Court for compelling a civil defendant to incriminate himself or be imprisoned for contempt is that to do otherwise would be to accept testimony untested by cross-examination and thus extend "a positive invitation to mutilate the truth a party offers to tell." If punishment for contempt were the only method of protecting the other party and the trier from a one-sided, distorted version of the truth the substantial encroachment made by the majority on the privilege against self-incrimination might be somewhat more tolerable. But it is not. For example, as an obvious alternative, such one-sided testimony might be struck in full or part, if the occasion warranted, with appropriate directions by the judge for the jury to disregard it as unreliable. And in some instances where the prejudice to the opposing party was extreme and irremediable the court might even enter judgment in his favor. See *Hammond Packing Co.* v. *Arkansas,* 212 U. S. 322, 349–354. Compare *National Union of Marine Cooks* v. *Arnold,* 348 U. S. 37. By such means the trial judge could protect the right of the opposing party to a fair trial. At the same time the witness would not be treated as having waived his privilege so that he could be punished by fine or imprisonment for refusing to incriminate himself.

Since I believe that petitioner's conviction should be reversed for the reasons stated above, I find it unneces-

sary to discuss whether she was entitled to a trial with all the safeguards of the Bill of Rights before she could be punished for the crime of contempt. My views in that respect are set forth in some detail in my dissenting opinions in *Sacher* v. *United States,* 343 U. S. 1, 14, and *Green* v. *United States, post,* p. 193.

MR. JUSTICE BRENNAN, dissenting.

I would reverse this judgment. The District Courts do not have the untrammeled discretion to punish every contemptuous act as a criminal contempt. That is the basic teaching of such decisions as *Ex parte Hudgings,* 249 U. S. 378, and *In re Michael,* 326 U. S. 224. It will not be gainsaid that danger of abuse of this extraordinary power inheres in the absence of the safeguards usually surrounding criminal prosecutions, notably trial by jury and any but self-imposed judicial restraints upon the extent of punishment. That danger of abuse has required this Court closely to scrutinize these cases to guard against exceeding the bounds of discretion in the use of the power. We do so in the exercise of our general supervisory authority over the administration of criminal justice in the federal courts, *McNabb* v. *United States,* 318 U. S. 332, 340, but primarily because of the "importance of assuring alert self-restraint in the exercise by district judges of the summary power." *Offutt* v. *United States,* 348 U. S. 11, 13.

With that principle in mind, I cannot conclude that it was proper to convict petitioner of criminal contempt. Her contempt consisted in refusing to answer questions put to her on cross-examination because she believed that the Fifth Amendment afforded her a privilege to make such refusals. The majority concedes that the reason given to the petitioner by the trial judge to prove her waiver was an incorrect one but concludes that "Taken in

context . . . [it] conveyed a correct statement of the law. ... ." The fact remains that the trial judge's ruling on waiver was incorrect. He advised Mrs. Brown that she had waived her privilege by the simple act of taking the stand. But the rule that the privilege is waived by taking the stand developed in criminal cases as an historical corollary of the fact that the accused could not even be called or sworn as a witness. 8 Wigmore, Evidence (3d ed. 1940), § 2268. It has no application in civil cases. In civil cases the most that can be said is that a party witness subjects himself to cross-examination as to all matters testified to on direct.

The trial judge made his final ruling on the question of waiver on the morning of February 18, 1955. He repeated his statement that Mrs. Brown had waived her privilege by taking the stand.* The petitioner, believing that her conduct was privileged, continued to refuse to answer. No further evidence was offered after the petitioner's refusal to answer the questions put to her on cross-examination by the Government. On that same afternoon the trial judge delivered his opinion finding "by clear, unequivocal and convincing evidence, that the defendant did procure her citizenship illegally and fraudulently." He then proceeded to hold the petitioner in contempt for her refusal to answer. It is true that at this time he advised the petitioner that she had waived

---

* "The COURT. The Court holds that the defendant having taken the stand in her own defense, has waived the right to invoke the Fifth Amendment, and I will permit the witness to answer the question.

.        .        .        .        .

"The COURT. The Court has just ruled that you having taken the stand in this case in your own defense, by so doing you have waived the right to invoke the Fifth Amendment. And I have just informed your counsel, and you, that you must answer the question. Now, if you do not answer the question, the Court will hold you in contempt of court."

her privilege by the testimony which she had given but it was of little help coming at the same time as the sentence.

In these circumstances, I can hardly believe that petitioner was guilty of such contempt of the authority of the court as to merit six months' imprisonment. The most that can be said of her conduct was that her lawyer could not predict that "taken in context" the appellate courts would sustain the trial judge's technically incorrect ruling on waiver.

This Court has recognized that the criminal-contempt power should be limited in its exercise to "the least possible power adequate to the end proposed," *In re Michael, supra,* at 227. The "end proposed," it should be clear, is not to impose vengeance for an insult to the court whose decree has been flouted, but to aid the fair and orderly administration of justice by deterring noncompliance with the court's lawful order. But I think that in contempts, as in other areas of the law, penal sanctions should be used sparingly and only where coercive devices less harsh in their effect would be unavailing. In other words, there is a duty on the part of the district judges not to exercise the criminal-contempt power without first having considered the feasibility of the alternatives at hand. MR. JUSTICE BLACK persuasively demonstrates in his dissenting opinion that the trial judge here might reasonably have resorted to several corrective devices to avoid both prejudice to the Government's case and unnecessary delay in the conduct of the trial. Cf. *Rubenstein* v. *Kleven,* 150 F. Supp. 47; Fed. Rules Civ. Proc., 37 (b). In addition, it appears that ordinary exercise of the civil-contempt power, cf. *Yates* v. *United States,* 355 U. S. 66, not even considered so far as this record shows, might have succeeded in achieving all the ends of justice without requiring resort to the far more drastic criminal sanction.

The Court does not ground the affirmance upon any finding that Mrs. Brown's conduct was actually disre-

spectful of the trial judge or that she obstinately flouted his authority. Indeed, her resort to her Fifth Amendment rights manifestly had substantial merit, for the majority does not say that the Amendment's protection against being required to give incriminating answers did not apply to the questions, but only that she waived the protection of the Amendment in the circumstances.

The situation, it seems to me, cried out for "alert self-restraint" by way of consideration of the other available correctives, before the judge took the particularly harsh step of sending Mrs. Brown to jail for six months. The trial judge gave no thought to the use of the other sanctions and, in my view, his exclusive reliance upon the criminal contempt power was arbitrary in the circumstances. I would therefore set aside the conviction.