Joseph **THOMPSON**, Petitioner,

v.

Donald **STAHL**, Respondent.

Civ. No. 2899.

United States District Court,
W. D. North Carolina,
Charlotte Division.

July 25, 1972.

George S. Daly, Jr., Charlotte, N. C., for petitioner.

Jacob L. Safron, Asst. Atty. Gen., of North Carolina, Dept. of Justice, Raleigh, N. C., for respondent.

## MEMORANDUM OF DECISION

McMILLAN, District Judge.

### PRELIMINARY STATEMENT

Late at night on May 14, 1971, Joseph Thompson, petitioner, was jailed for thirty days by Magistrate James A. Medlin under a contempt citation. He exhausted North Carolina state remedies and then petitioned this court for habeas corpus to relieve him from service of the remaining seventeen days of his sentence, for an order declaring the contempt citation unlawful, and for an order expunging the contempt conviction from the public records. Service of the remaining seventeen days was ordered suspended pending trial of this action, and an evidentiary hearing was held.

The court finds that the action of the magistrate in punishing petitioner, then intoxicated, for "contempt of court" by loud talking and calling the magistrate a liar while awaiting booking in a locked cell in the locked booking room under the Mecklenburg County jail late at night was unlawful; all relief sought is granted.

### FINDINGS OF FACT

About nine-thirty on the night of May 14, 1971, Joseph Thompson went, thoroughly intoxicated, to the Isaac Hayes show at the Charlotte, North Carolina, Coliseum. Around ten o'clock he was apprehended by Charlotte city police, was placed under arrest for public drunkenness, and was taken bodily to the booking room, which is located under the Charlotte city jail, and has its own outside entrance. His testimony showed that he was knocked down, beaten about the head and body, struck his head on some concrete stairs, was handcuffed and then was hit and kicked by numerous policemen, was rendered unconscious by this treatment, and was unconscious from the time he was thrown down and beaten at the Coliseum until after his arrival at the booking room. Evidence for the respondent included testimony that Thompson resisted arrest, was disorderly, and was subjected only to such force as was necessary to restrain him and transport him to headquarters for booking. Whatever the source of his problem, it is apparent and the court finds that he was in very poor condition, mentally, physically, and chemically, when he reached the booking room.

The booking area and the magistrates' office are housed in a single rectangular space thirty or forty feet in length. The magistrates sit with their backs to the end wall, working at a row of desks and looking across these desks, through a heavy metal screen, lengthwise down the booking room. At the far end of the booking area and off to the left is a holding cell with steel bars where prisoners may be kept. The booking area, including the magistrates' desks, has concrete walls and steel doors with electronic controls, and the general public can not get into it; it is only accessible to the magistrates, to police personnel, and prisoners in their custody.

The general public are only allowed in the public part or lobby, which is a corridor several feet wide with a window through which the public can talk to officers and others in the booking area and through which, across the narrow width of the booking area, people in the holding cell can see members of the public at the window on the other side of the room.

On May 14, 1971, no signs anywhere said "Court" or indicated that any court was in session. There was no bailiff nor anyone appearing to be such. There were no seats for the public. The magistrates were three men in street clothes seated at the desks behind the metal screen at one end of the enclosure. There was no evidence of any trial in progress or of examination or cross-examination of witnesses. Other people charged with crimes, including drunkenness, were present in the booking area.

Thompson, handcuffed, drunk and beaten, was brought into the booking area by the police. He became loud and boisterous, obscene and profane. He walked around. Magistrate Medlin, from his

desk behind the metal screen, became upset at the commotion, told Thompson he was drunk and had to quiet down, and then had him locked up in the holding cell, at the far end of the booking area. Thompson, after he had been locked up in the cell, continued to call out to people outside the booking area and in the public corridor whom he could see through the window at the counter on the other side of the room.

Medlin sent some police officers into the holding cell, where a scuffle ensued, and where, according to several witnesses, the officers beat on Thompson some more. He and several witnesses said he was beaten without provocation, and at the direction of Magistrate Medlin. Witnesses for the respondent said that Thompson had started the fight, and was beating on another prisoner (whose name and identity were never disclosed in court) who was in the cell with him. Thompson and several other witnesses say that there was no fight between Thompson and anyone else; that no one else was visible in the cell; and they contend that it was simply a case of officers assaulting Thompson at the suggestion or direction of Magistrate Medlin. Thompson's sister, "Tina" Thompson, saw the altercation between Thompson and the police and became hysterical.

Magistrate Medlin again became disturbed at the commotion. He went over and told Thompson that he would give him thirty days in jail for contempt of court if Thompson did not get quiet. Thompson's response was, "You're a liar. You can't do it." Medlin replied, "You now have thirty days."

Medlin, the magistrate, was not at that time nor ever engaged in any work on the Thompson warrant. He was working on a warrant for somebody else. He was not the magistrate who eventually typed the warrant against Thompson (for public drunkenness, resisting arrest and assault on officers). He said that Thompson was drinking but not drunk, and that he did not know that Thompson was to be charged with public drunkenness. Thompson's alleged assault upon the fellow cellmate was not a part of the contempt for which the citation was issued. Eight or ten police officers were in the booking-magistrates' room when these events took place.

Medlin, whose testimony was not consistent on the material facts, testified that Thompson had not called him any names *before* the contempt citation was announced; that Thompson did not appear to have any signs of injury; that Thompson was drinking but not drunk; that choking the cellmate and calling Medlin a "S-O-B" were not reasons for the contempt citation; and that the "S-O-B" language occurred *after* the contempt citation had been announced.

Thompson had not been booked; the arrest sheet had not been made out; and according to the arresting officer, Hinson, and numerous other witnesses, he was drunk at the time, although he had not completely lost control of all his faculties.

At no time did Medlin call upon any of the eight or ten police officers present to do anything to remove Thompson, the loudest drunk in the group, from the area, so that such interference as he was causing could be eliminated. Officers David Jordan and Michael Hinson were positive, and the court finds, that the commotion in which Thompson was "waited upon" in the cell by the police officers took place before the incident which apparently precipitated the contempt citation.

Magistrate Medlin is fifty-one years old; he has been a magistrate since February of 1970; before that time he was a life insurance company representative; his training as a magistrate was a short course at the Institute of Government and on-the-job training under other local magistrates, the local court clerk, and the chief district judge.

Medlin testified that he had held people in contempt before and that he *"Could not recall holding a person in contempt who was not also drunk"*!

Under North Carolina General Statutes, § 5–1(1), a person may be punished for contempt if he is guilty of

"disorderly, contentious or insolent behavior committed during the sitting of any court of justice in immediate view and presence of the court, and tending directly to interrupt its proceedings or to impair the respect due to its authorities."

Contempt committed in the "immediate view and presence of the court may be punished summarily," under North Carolina General Statutes § 5–5. Further, section 5–6 gives a magistrate "the power to punish for contempt while sitting for the trial of causes or while engaged in official duties."

Issuing warrants and setting bonds are part of the magistrate's official duties. In fact, these were apparently the chief duties of Medlin and his two colleagues at the time. Technically, therefore, G.S. § 5–6 may appear to justify the exercise of contempt power.

Nevertheless, it would appear to be an extreme and unnecessary extension of contempt authority to uphold the magistrates' power to punish for contempt under these circumstances.

The most reasonable factual conclusion from the testimony is that the asserted power of contempt has been substituted for the more conventional uses of police power to subdue a boisterous night-time drunk being held in a cell pending preparation of formal charges.

It is the opinion of this court that the drunken conduct of Joseph Thompson on the night in question did not constitute criminal contempt. He was beaten and hauled in a squad car, drunk, from the Coliseum to the booking area underneath the jail. Once arrived he behaved, as drunks are wont to do, in a boisterous, rude, profane and obscene manner. After arriving at the jail, he was put in a locked room and shortly thereafter into a locked cell which in the United States (the "dock" at the old Bailey notwithstanding) connotes a *jail* rather than a *court*. Numerous policemen and prisoners were his only neighbors in the room. Some men in civilian clothes, visible through a thick steel screen, were sitting at typewriters at the far end of the room. One of these men, disgruntled, came and told him that he was a magistrate and that Thompson would be jailed for thirty days for contempt of court if he didn't quiet down. These words did not convert the holding cell nor the booking room into a court, nor did they set the stage for any valid exercise of contempt power.

Even taking the facts, as set out in Magistrate Medlin's contempt judgment and as developed at the evidentiary hearing, in the light most favorable to the respondent, this was an invalid exercise of contempt power under the North Carolina statutes. Given the circumstances related above, it impugns fundamental fairness to read North Carolina General Statutes §§ 5–1, 5–5, and 5–6 as empowering magistrates to issue contempt citations on these facts.

We therefore conclude that the exercise of the contempt power on these facts is an unconstitutional act, fundamentally unfair, which violates due process of law.

This conclusion also is supported by the recent action of the United States Supreme Court in In re Little, 404 U.S. 553, 92 S.Ct. 659, 30 L.Ed.2d 708 (January 24, 1972), a habeas corpus decision reversing a contempt judgment issued by a district judge of Forsyth County, North Carolina, in which the court states:

"Therefore, 'The vehemence of the language used is not alone the measure of the power to punish for contempt. The fires which it kindles must constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil . . . . [T]*he law of contempt is not made for the protection of judges who may be sensitive to the winds of public opinion.* Judges are supposed to be men of fortitude, able to thrive in a

hardy climate.' Craig v. Harney, 331 U.S. 367, 376 [67 S.Ct. 1249, 91 L.Ed. 1546; (1947). *'Trial courts . . . must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice.'* Brown v. United States, 356 U. S. 148, 153 [78 S.Ct. 622, 2 L.Ed.2d 589] (1958)." [Emphasis added.]

As *Little* explains, judges (and magistrates) must be hardy souls. The affront suffered by Magistrate Medlin, when weighed against any imminent threat to the administration of justice, does not suggest a proper climate for exercising the contempt power.

Neither the reasonable intention of G.S. § 5–6 nor the fairness requirements of the due process clause of the United States Constitution support use of a court's power of contempt by a booking magistrate to maintain order among drunks in the booking room under the jail late at night.

It is therefore ordered, that the writ of habeas corpus is granted; the contempt adjudication is declared invalid and unconstitutional; defendant is directed to release the prisoner finally from custody; and the records of the contempt citations are ordered to be expunged from the official court records of the Court of Justice of Mecklenburg County, North Carolina.