Doris E. SHANNON,
Plaintiff-Respondent,

v.

Hugh J. SHANNON, et al.,
Defendants-Appellants.

Nos. 13015, 13203 to 13206,
13274 and 13275.

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 24, 1984.

Motion for Rehearing or to Transfer
Denied Nov. 16, 1984.

Application to Transfer Denied
Dec. 18, 1984.

Loren R. Honecker, Sherwood, Honecker & Bender, Springfield, for defendants-appellants.

Thomas Strong, Mathew W. Placzek, Kerry L. Myers, Strong, Placzek & Wooddell, P.C., Springfield, for plaintiff-respondent.

FLANIGAN, Judge.

The principal adversaries in these consolidated appeals are plaintiff Doris Shannon and defendant Hugh Shannon ("Shannon"), who married each other in 1958. Three children were born of the marriage, Karen, Dena, and Phillip. Phillip, the youngest, was a minor when the instant action was filed and reached majority during its pendency.

In March 1978 Doris and Shannon executed a revocable living trust in which Shannon was named trustee and sole life beneficiary. In September 1978 Shannon filed Case No. 4516 in the Circuit Court of Barry County, seeking dissolution of the marriage. An entry of appearance, purportedly signed by Doris Shannon, was filed in that action. In October 1978 a decree was entered approving a property settlement agreement, signed by Doris and Shannon, and dissolving the marriage.

In September 1981 Doris Shannon filed the instant action against Shannon in the Circuit Court of Barry County, challenging the validity of the proceedings and decree in Case No. 4516 and also challenging the validity of the trust and transfers of property to the trust. The amended petition, on which the case was tried, added the three children as parties. Each child was named individually and as a beneficiary and trustee of the trust which Shannon had amended. Also added as a defendant was Shannon in his capacities as trustee and beneficiary of the trust. The two daughters defaulted. The trial court found the issues generally in favor of Doris Shannon and made a division of the property. Shannon and Phillip Shannon appeal.

As his points on appeal Shannon asserts that the trial court erred in taking the following actions: (1) setting aside the trust; (2) entering an order on October 13, 1982, striking the pleadings of Shannon in his capacity as trustee for failure to make discovery; (3) entering an order on October 15, 1982, appointing a receiver; (4) requiring Shannon to waive his constitutional privilege against self-incrimination as a condition to allowing him to testify; (5)

awarding plaintiff damages and other relief not requested in the petition; (6) granting relief to the defaulting defendants, Karen Shannon and Dena Shannon; (7) awarding plaintiff "court costs" and expenses which were not supported by evidence. As his point on appeal Phillip Shannon asserts that the trial court erred in denying his pretrial application for a continuance. These contentions, none of which is valid, will be considered in that order.

The record on appeal, which this court has scrutinized, is voluminous. The trial, which began on November 10, 1982, lasted a week and was preceded by 11 hearings. The legal file exceeds 500 pages. The transcript consists of 16 volumes. The litigation defies capsule description. The trial judge, Honorable Jack A. Powell, entered a judgment which he later extensively revised. The judgment contains findings of fact including those set forth below and prior to the discussion of appellant's first point. None of these findings is seriously challenged and all are supported by the record.

Plaintiff Doris Shannon married defendant Shannon in 1958. Both of them were "lacking in formal education." Doris was 17 at the time of the marriage and she had no earning capabilities beyond that of ordinary clerical work. Shannon "developed into a very capable businessman and has an understanding of money and the investment of money that few people can match." Shannon managed a bank and "knew how to trade money investments and farms." Between 1966, when Shannon quit maintaining an office in the home, until September 1981 when the instant lawsuit was filed, Doris "had no knowledge of Shannon's business dealings nor knowledge about how much property, tangible and intangible, they had as marital property." Shannon did not disclose to Doris any of his business dealings and "he kept his business decisions to himself." Frequently Shannon would have Doris sign documents "without exposing the full document to her vision." Doris "did not question him for two reasons, because she trusted him to do the

right thing and because she was afraid of him."

Shannon "devised a plan whereby all of their properties should be placed under his sole control. To do this Shannon had a revocable living trust agreement prepared." The agreement, dated March 20, 1978, was executed by Shannon and Doris as grantors. They agreed to, and did, convey assets to Shannon as trustee. In the latter capacity Shannon was given total control over the trust estate and Shannon was the sole life beneficiary. Shannon, as trustee, had the power to invade the principal for Shannon's benefit. On Shannon's death Doris and two others would become successor trustees. The successor trustees were to pay any taxes or debts owed by Shannon at his death. Shannon's living children were designated as successor beneficiaries. Shannon, as grantor and "acting alone," was empowered to revoke the trust and to receive "as his own property" all of the trust estate. Shannon, as grantor, could require delivery of any trust asset and Shannon, as grantor, reserved the right to modify the trust.

Although the trust was signed in the office of Shannon's attorney, who read the agreement to Doris, "the evidence is clear that she had no comprehension of what she was executing." The trust estate was to be described in an exhibit to be attached to the trust instrument but no such exhibit "ever surfaced." Doris "not only did not understand the terms and conditions of the trust, but thought she had a right to participate in the decisions of the trust because she had been named as a trustee." She became a trustee only upon the death of Shannon. The trust "was approached to her as a device to protect their children."

Shannon "began to tell Doris that he was not doing well financially" and that he was thinking about going to Topeka, Kansas to see if he could not do better. Shannon suggested that they had not been getting along too well and it might be best if they would make a property settlement in the event one of them wanted to get divorced

later on. Doris thereupon executed, on September 8, 1978, a property settlement agreement, just as she executed all other instruments he placed before her. Apparently without realizing it she also executed "a waiver of notice in a divorce [proceeding]."

Also on September 8, 1978, without Doris's knowledge, Shannon, as plaintiff, filed a dissolution action in Barry County although both Shannon and Doris were then residents of Greene County. On October 20, 1978, Shannon appeared with his attorney before the Circuit Court of Barry County and at that time "Shannon completely misled the court." Shannon testified that the property settlement was fair and conscionable in light of Doris's conduct in the past. The trust instrument was never presented to the court. Shannon testified, falsely, that he had advised Doris that she was entitled to separate counsel. Shannon "intentionally misled Doris with respect to the filing of the divorce" and Doris did not learn, until 1981, that the dissolution decree had been entered in 1978.

From the date of the 1978 decree until 1981 there was no change in the life style of the parties. Shannon continued to live in the home and sleep in the same bed with Doris. She continued to fix his meals, care for the children, and do his laundry and other household duties expected of a housewife.

At the time of the 1978 dissolution decree the proposed property settlement "left Doris with approximately $25,000 in a certificate of deposit and $1,000 per month as child support." At the time the property settlement was made, "the net worth of Shannon and Doris was approximately $2,500,000 or more." On March 1, 1977, Shannon had a net worth of $1,981,000. On October 15, 1978, his worth was $2,911,930. On September 1, 1980, Shannon's assets were $3,440,000. On June 1, 1978, the nearest date to the date of the 1978 decree, Shannon's net worth was $2,551,329.

Shannon kept the divorce a secret from Doris. In September 1981, in a deposition

in another lawsuit, Shannon testified that he was still married to Doris and he answered "no" to the question, "Have you ever been divorced."

On August 14, 1981, Shannon amended the trust to eliminate Doris as a successor trustee. On December 31, 1981, Shannon again amended the trust by declaring that it was "an irrevocable living trust agreement of [Shannon] effective this date," but the same document reserved to Shannon "the right to amend the foregoing instrument in whole or in part."

In December 1981 Shannon discussed with a bank examiner the matter of "transferring assets and getting them out of trust." Shannon told the examiner that he "wanted to transfer to keep it from his wife Doris." "Fraudulent acts on the part of Shannon were shown by 13 exhibits." The exhibits included forgeries of Doris's signature by Shannon.

On January 8, 1982, a restraining order was issued by Judge James H. Keet, Jr., who was then sitting in the instant case. The purpose of the order was to "preclude Shannon from making unexplained expenditures and transfers, avoid any waste, and protect the marital estate from the dissipation of the assets." Shannon violated this restraining order "time after time."

"On a number of times [Judge Powell] has issued orders to Shannon to produce certain records or to produce himself for examination and permit an examination of the properties involved, and time after time these orders have been ignored."

In the summer of 1982 an agreement was made between the court and the attorneys, including Shannon's attorneys, striking a June trial setting and continuing the case until November. Shannon's attorneys "were unable to carry out their agreement with the court and Doris's attorneys and had no alternative but to step out of the case. Therefore, if the records in this case appear incomplete as to evaluations or as to preparation of the case, the court finds such is due to the refusal of Shannon to

cooperate with counsel and obey the orders of the court."

Shannon moved that "the trustee and the beneficiaries of the trust" be made parties to this action. The court sustained the motion, made them parties, and appointed an attorney as guardian ad litem for the minor child Phillip Shannon. "The court finds that under the facts as they developed this was not necessary but offered another instrument for Shannon in that Shannon used his son for the purpose of his own self-interest."

"Shannon gave Phillip monies and other benefits improperly." Most of the marital property consists of real estate. Shannon "executed farm leases to Phillip for a period of years with the right of extending these leases." This was done after Judge Keet entered the restraining order.

Shannon was previously married to Bennie Nell Horton. That marriage was dissolved by an Arkansas divorce decree in 1955. In 1957 Bennie Nell Shannon, Shannon's divorced wife, married one Massey. In 1982 Shannon paid Bennie Nell Massey $20,000 to go through a divorce action in Webster County, Missouri. The purpose of the Webster County action "was to show that Shannon and Doris had never been legally married." The 1955 Arkansas decree was valid.

After the execution of the trust in 1978 Shannon made financial statements, for the purpose of obtaining loans, in which he made no mention of the trust and claimed to be the sole owner of all of the marital property. "The trust was a sham. To permit this trust to stand would be to promote trickery."

"Under the facts and the law the property settlement agreement [in 1978] was unconscionable because Doris was overreached by Shannon. It is difficult to imagine a case or set of facts which disclose such a clear overreach on the part of one party as to another. Shannon, at the time he obtained the [1978] divorce was worth perhaps $2,000,000 or more. Doris was to receive $1,000 per month for child support for a period of years and then perhaps $25,000, or a portion of a $100,000 certificate of deposit which never did appear. At the end of approximately eight years Doris would wind up with nothing but perhaps $25,000. She does not get to keep the home. She does not have anything out of a $2,000,000 estate."

"When Doris and Shannon got married in 1958 Doris had $100 and the clothes on her back. Shannon had an old automobile and $100 he had borrowed from his father. Since that time Doris has done exactly as Shannon has wanted her to do. She has raised the children and has not butted into his business and has given him a free hand. After Doris raised the children Shannon no longer wants to be married to her. Shannon set up a plan which would prevent Doris from having protection of her marital rights."

The property agreement in 1978 was unconscionable, was procured through fraud and should be set aside. "In order to lay the groundwork for obtaining a property settlement with Doris, Shannon began to poormouth the situation as it existed and was thinking about going to Topeka in order to try and do better financially. Therefore Shannon's willingness to set up a $100,000 certificate of deposit as protection for Doris and the children, even though he might have to borrow the money, was certainly magnanimous on his part and certainly Doris could not see anything improper in that, in view of her lack of knowledge of Shannon's assets. If, however, Shannon had been honest with her and told her about their assets, Doris would not have signed for the amount designated in the property agreement. The whole set-up is fraudulent and should be set aside. In order to avoid fraud between husband and wife, agreements between husband and wife as to settlement of property rights should be fair, just and equitable. These conditions did not exist."

The divorce obtained by Shannon from Bennie Nell Massey in 1982 "was a sham." The 1958 marriage of Shannon and Doris was valid. "The sham divorce in Webster County is an illustration of the extent to

which Shannon has gone in money and effort to preclude Doris from having any rights to any marital property of any significance."

The court and the parties "were in a difficult position in this cause to determine the financial worth and value of the assets of the marital estate. The court holds that all property within the trust and all property of both Shannon and Doris were marital property and were subject to division. The problem is an evaluation of these properties for the reason that Shannon did not permit persons to go on the properties to make appraisals even though ordered by the court to do so. Shannon would not produce records from which values could be obtained."

"In all ways possible [Shannon] tried to prevent anyone from ascertaining what properties he allegedly owned or what those properties were worth. In consequence Doris has relied upon financial statements which Shannon has prepared. Doris takes the position that her evaluations are minimal. Shannon argues, through his attorneys, that this is not correct for the reason that all people 'puff up' the value of their assets when preparing financial statements of their net worth. This may be true, but [the court] is relegated to the use of Shannon's evaluations because Shannon refused to cooperate and permit appraisals to be made by independent persons."

Judge Powell set aside as fraudulent the property settlement approved in the 1978 proceeding. He did not disturb that portion of the 1978 decree which dissolved the marriage. No complaint is made on that aspect.

Shannon's first point is that the trial court erred in invalidating the trust because there was no substantial evidence to show that Doris was induced to execute the

trust under circumstances amounting to fraud.

In *Curtis v. Kays*, 670 S.W.2d 887 (Mo. App.1984), a woman brought an action against her former husband to set aside a separation agreement, previously approved in a marriage dissolution proceeding, on the ground that fraud had been perpetrated by the husband in procuring the agreement. The court, at p. 893, said:

"In addition to being free of fraud, agreements between husband and wife in settlement of property rights should be fair, just and equitable.... Concealment of a material fact of a transaction which a party has a duty to disclose constitutes fraud as much as though an affirmative representation is given.... If a fact is peculiarly within the knowledge of one party by reason of his superior knowledge and not within the fair and reasonable reach of the other party, a legal duty of disclosure arises and concealment of the fact by silence is fraud...." (Citing authorities.)

The invalidity of Shannon's first point is demonstrated by the findings of the trial court previously recounted. Fraud on the part of Shannon permeates the entire record. Possessed of a remarkable talent to make money, Shannon's conduct proves him to be a master villain, a man whose deceitful actions with respect to Doris are matched, in odium, only by his repeated and outrageous acts of contempt in defying proper orders of Judge Powell and his predecessor judges.[1]

Doris executed the trust agreement, itself incomplete with respect to description of trust property, at the instance of Shannon who had failed to disclose to her the nature and extent of the marital assets. There was testimony, essentially unchallenged, that the execution of the trust could not be justified by Shannon on the theory that it was a device to reduce estate

---

**1.** This court, in its discretion, has not addressed the basic issue of whether Shannon's conduct in defying numerous orders of the trial court is alone sufficient to warrant dismissal of his appeal. See 49 A.L.R.2d 1425 (Dismissal of appeal for appellant's failure to obey court order). At

p. 1429 are cases involving dismissals where the disobeyed order is an order of the trial court. The annotator states there is considerable judicial disagreement as to whether an appeal can be dismissed for the appellant's disobedience of an order of the trial court.

taxes. Indeed the testimony was that the execution of the trust would increase those taxes by over half a million dollars. The only purpose of the trust was to give Shannon sole control of marital property.

The Mephistophelian scheme of Shannon to defraud Doris of essentially all of her share of the marital assets is apparent from the pattern of the 1978 events and confirmed by his later transgressions. The trust was executed in March 1978 with Doris unaware of its legal significance and unaware of the extent of the fortune which her husband had amassed. Only a few months intervened between the execution of the trust and the execution of the property settlement. Transfers of major assets to the trust were made between the execution of the trust and September 8, 1978, when the "separation and property settlement agreement" was signed by Shannon and Doris. Although that agreement described only a portion of the marital assets, its most glaring omission was the failure to ascribe values to any of them.

The settlement agreement gave to Shannon stock in five corporations, a one-half interest in a partnership, as well as other assets. Doris was given no corporate stock and no interest in the partnership. The agreement recited that all property placed by Shannon and Doris "in the trust" of March 20, 1978, "at that time and since then shall be the separate property of [Shannon]."

At the 1978 dissolution hearing Shannon appeared personally and by counsel. Doris did not appear. The trial judge, who then approved the property settlement, did not realize that in so doing he was awarding Shannon over $2,500,000 and awarding Doris perhaps $25,000 to be collected by her at some time in the future. Shannon's failure to disclose these matters was a fraud upon the court.

All of the property in issue was marital property. Neither Doris nor Shannon owned property of significance prior to the marriage and Shannon makes no claim that any of the assets was non-marital. Al-

though Shannon may have induced Doris to sign an entry of appearance in the 1978 divorce proceeding if in fact he did not forge her signature, he later concealed from her the facts that the action had been instituted, a hearing held, and a decree entered which approved the separation agreement. He returned to the family home and lived with Doris as her de facto husband until, in 1981, she accidentally learned of the 1978 decree.

The transfers of the marital property to the trust were without consideration and they were executed by Doris, in conjunction with Shannon, when she was unaware of the nature and extent of their holdings. By those transfers Shannon gained. everything and lost nothing; Doris lost everything and gained nothing. Shannon's grand design to deprive Doris of her property rights is evidenced, even after the filing of the instant action, by his calculated and futile efforts to invalidate his marriage to Doris by attempting to nullify the 1955 Arkansas decree dissolving Shannon's previous marriage.

The record justified, indeed compelled, a finding that the execution of the trust by Doris was procured by Shannon's fraud. Shannon's first point has no merit.

■ Shannon's second point is that the trial court erred in entering an order on October 13, 1982, sustaining Doris's motion for sanctions against "Hugh Shannon, Trustee" and striking the pleading of "Hugh Shannon, Trustee" and declaring "Hugh Shannon, Trustee" to be in default because the sanctions were invoked, under Rule 61.01(d),[2] due to Shannon's failure to make discovery and such failure was by Shannon only in his "individual capacity" and "not in any representative capacity as trustee."

Understandably Shannon makes no effort to relieve himself, in his individual capacity, from the effect of the challenged order. The fact is, however, that during the five-day trial Shannon's attorneys oper-

---

**2.** All references to rules are to Missouri Rules of Court, V.A.M.R.

ated in a fashion totally free from the effect of the order and represented Shannon to the same extent as if his pleading had not been stricken.

By this point Shannon is attempting to induce this court to lend recognition to the trust which the trial court, on the basis of overwhelming evidence, properly found to be a sham. Shannon and Shannon, Trustee, are one and the same scoundrel. Indeed Shannon in his capacity as trustee did not file a brief. Shannon presents his second point in his individual capacity and fails to apprise this court, even if the existence of the trust were conceded, how the ruling prejudiced Shannon as an individual. Shannon's second point has no merit.

Shannon's third point is that the trial court erred in entering an order on October 15, 1982, appointing a receiver. The ruling was erroneous, says Shannon, because Doris's motion seeking such appointment was defective and Doris "failed to adduce any evidence of imminent danger or threat of loss of any property" at the hands of Shannon.

Rule 68.02(a) reads, in pertinent part: "Whenever in a pending legal or equitable proceeding it appears that a receiver is necessary to keep, preserve and protect any business, business interest or property ... the court ... may appoint a receiver whose duty it shall be to keep, preserve and protect ... that which he is ordered to take into his charge."

On December 16, 1981, Doris filed a motion requesting the court to appoint a receiver. In the trial court Shannon made no attack on the adequacy of the motion. It will be observed that the rule does not expressly require the filing of a motion. "A court may on its own motion appoint a receiver whenever a proper case is made, even though neither party to the controver-

sy asks for or desires his appointment." 65 Am.Jur.2d Receivers § 103, p. 934.

On October 15, 1982, a hearing was held on the motion and a receiver was appointed. Between the date of the motion and the date of the appointment Shannon violated the restraining order restricting the use and transfer of the marital assets and violated many court orders with respect to discovery. Before the receiver was appointed the court had held nine evidentiary hearings on other matters, most of them involving improper conduct on the part of Shannon. The need for the appointment of a receiver was clear and the court was not required to blind itself to Shannon's persistent misdoings and confine itself to the content of the motion. Indeed after the receiver was appointed Shannon failed to cooperate with the receiver and continued to conceal and appropriate marital assets. An arsonist should not complain about the arrival of the fire department on the theory that the telephoned message to the station contained a split infinitive. Shannon's third point has no merit.

Shannon's fourth point is that the trial court erred in requiring him to waive his privilege against self-incrimination as a condition to allowing him to testify because the requirement deprived him of due process of law "in that it effectively and illegally prevented him from presenting his cause on the issue of damages."

Near the presentation of Shannon's evidence on the last day of the trial the following occurred immediately after the lunch recess: [3]

MR. BALL (Attorney for Shannon): As I understand the court's admonition before we broke for lunch, it is that if Mr. Shannon voluntarily takes the stand and testifies and then during cross-examination, in-

---

**3.** Shannon's brief says, "During a noon recess an unreported colloquy was held.... The judge apparently informed defense counsel that if Shannon testified and attempted to invoke his privilege against self-incrimination, the court would jail him (apparently for contempt)."

"This court has neither the power nor the inclination to permit the disposition of this appeal to be governed by alleged happenings 'off the record.' A judgment is not so porous and a successful attack upon it requires a worthier foundation." *Cobb v. R.W. Beasley Const. Co.,* 536 S.W.2d 535, 537 (Mo.App.1976).

vokes the protection of the Fifth Amendment on questions of counsel for plaintiff, that the court will order him to answer and if he refuses to do so, the court will then put him in jail.

THE COURT: The court will take action, yes.

MR. BALL: Okay. I had understood that's what the court had indicated.

THE COURT: Yes.

MR. BALL: Since that be the case we don't believe we can jeopardize Mr. Shannon's liberty in that fashion and we, therefore, would decline to call him as a witness.

In *Brown v. United States*, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958), the Supreme Court held that a trial court had the power to imprison for criminal contempt a witness who took the stand voluntarily and testified on her own behalf and thereafter refused, on cross-examination, to testify regarding matters made relevant by her direct examination. In those circumstances the witness could not invoke her privilege against self-incrimination.

Shannon's brief, which makes no attempt to state what his testimony would have been if he had testified, seeks to place an unjustified interpretation upon the foregoing colloquy between the court and attorney Ball. There is nothing in that colloquy to indicate that the court would take any action inconsistent with the power it could properly exercise, under *Brown*, with regard to Shannon's federal constitutional rights. Shannon makes no claim that his privilege against self-incrimination under the Missouri Constitution is broader than its federal counterpart. See *State v. Swisher*, 364 Mo. 157, 260 S.W.2d 6, 10[3–5] (1953).

■ On October 13, 1982, the trial court entered an order striking Shannon's pleadings for failure to make discovery. As mentioned under Shannon's second point, Shannon, in his individual capacity, makes no challenge to that order. In *Portell v. Portell*, 643 S.W.2d 18, 20 (Mo.App.1982), the trial court struck appellant's pleadings for failure to make discovery and refused to allow appellant to testify, cross-examine or call witnesses. The court of appeals held that a judgment entered by reason of the sanctions authorized by Rule 61.01(b) "is not the default judgment in the ordinary sense but is treated as judgment upon trial by the court.... The sanctions prohibiting appellant's participation in the trial were therefore within the trial court's discretion." Shannon's fourth point has no merit.

Shannon's fifth point is that the trial court erred in granting Doris damages and other relief set forth in paragraphs 18, 19, 21, 24, 29, 30, 31, 32, 33 and 34 of its judgment because the relief was greater or different from that requested in the petition.

Shannon's brief presenting this point was filed in April 1984. Thereafter this court remanded the cause to the trial court for the purpose of correcting the judgment in several respects. Shannon and all other parties were afforded the opportunity to file additional briefs in light of any corrections made by the trial court. On August 20, 1984, the trial court entered the corrected judgment. Shannon did not file an additional brief.

■ Paragraphs 18, 29, 31 and 32 of the original judgment were amended by the trial court and Shannon has failed to show that the amendments did not satisfy his criticisms of those paragraphs in their original form. Paragraphs 19, 21 and 33 of the original judgment were criticized on the theory that the trial court improperly appointed a receiver. For the reasons set forth in the discussion of Shannon's third point, his criticism of these paragraphs lacks merit. Shannon's criticism of Paragraph 24 is not stated in his argument under his fifth point and is accordingly abandoned. Relief awarded under Paragraph 30 was within the scope of the relief requested. Paragraph 34 of the original judgment was deleted by the corrected judgment. Shannon's fifth point has no merit.

■ Shannon's sixth point is that the trial court erred in granting relief to the defaulting defendants Karen Shannon and Dena Shannon. Paragraphs 8 and 27 of the original judgment purported to grant such relief but the corrected judgment of August 20, 1984, deleted the portion of Paragraph 8 which so granted. Paragraph 27 was amended by the corrected judgment and Shannon has failed to show that the amendment did not satisfy his criticism of that paragraph in its original form nor has Shannon demonstrated that Paragraph 27, in its original or amended form, was inconsistent with his position in the trial court. Shannon's sixth point has no merit.

■ Shannon's seventh point is that the trial court erred in awarding plaintiff "court costs and expenses" which were not supported by the evidence. Shannon also argues that some of the costs and expenses awarded were not shown to have been reasonable and necessary and that the awards "were partially duplicitous." In the corrected judgment the trial court received and approved the final accounting of the receiver. Shannon has not challenged the accounting or its approval. The items of which Shannon complains under his seventh point have been reviewed by this court in light of the receiver's report and the corrected judgment. Some of those items are not of the routine variety for this type of litigation but each of them was incurred by reason of Shannon's misconduct. This court finds that the items were reasonable and necessary and properly taxed as costs. Shannon's seventh point has no merit.

As his sole point on appeal appellant Phillip Shannon contends that the trial court erred in denying his application for a continuance because he was thereby deprived of "the meaningful representation of his interests."

On August 6, 1982, pursuant to a previous order of the court requiring the joinder of additional parties, Phillip Shannon was made a defendant. Earlier in the summer the case had been reset for trial beginning November 8. On August 25, 1982, Gerald Gleason, a veteran attorney, was appointed as his guardian ad litem. On September 24, 1982, Phillip Shannon filed an answer. On October 29, 1982, Phillip Shannon filed an application for a continuance and sought a striking of the trial setting. The application was denied on November 9, 1982.

On October 1, and again on October 13, the court held hearings at which Mr. Gleason was present. On each occasion Judge Powell stated that the trial had been long delayed and no further continuances would be granted. At the trial itself Mr. Gleason actively and ably represented Phillip Shannon as his attorney. As stated earlier, Shannon's attorneys participated fully in the trial although his pleading had been stricken. Any interest which Phillip Shannon had in the litigation was confined to that which he purportedly received under the trust which was itself a sham. On this appeal Shannon and Phillip are represented by the same counsel.

■ Phillip's brief makes no effort to set forth what his guardian ad litem could have done which he failed to do in the representation of his interests. The record makes it clear that Phillip's guardian ad litem was afforded sufficient time to prepare for trial and to represent Phillip's interests. The trial court did not abuse its discretion in denying the application for a continuance.

All motions "taken with the case" are now denied.

The judgment is affirmed.

TITUS, P.J., and GREENE, J., concur.

CROW, J., disqualified.