In the Matter of JERALD WERLIN, Petitioner, v RICHARD GOLD-
BERG, as Justice of the Supreme Court of the State of New
York, Respondent.

Second Department, July 13, 1987

**APPEARANCES OF COUNSEL**

*Caesar Cirigliano (Ivar Goldart* of counsel), for petitioner.

*Robert Abrams, Attorney-General (Myron Paul Schamis* of counsel), for respondent.

### OPINION OF THE COURT

Per Curiam.

This is a proceeding pursuant to CPLR article 78 to review a determination of the respondent, dated July 14, 1986, which adjudged the petitioner guilty of criminal contempt of court and imposed a fine of $250 upon him.

We conclude that the petitioner was properly found guilty. Accordingly, we confirm the determination and dismiss the proceeding on the merits.

The adjudication of contempt occurred during a trial in the case of *People v Melvin Jones* (indictment No. 5981/85) in Kings County, in which the defendant was charged with the crime of robbery in the second degree. The petitioner, who was assigned to defend Melvin Jones, has been employed as an attorney for the Legal Aid Society since 1972. The respondent, Richard Goldberg, is a duly elected Judge of the Civil Court of the City of New York sitting by designation as an Acting Justice of the Supreme Court, Criminal Term. The determination of July 14, 1986, charged that the petitioner "did wilfully act in a disorderly, contemptuous and insolent manner during a session of the Court, and in its immediate view and presence, to wit: stated to the court 'you made enough bad law in this case' after repeated warnings during trial regarding disrespectful behavior to the court which behavior directly tended to impair the respect due to its authority". The petitioner thereupon brought the instant CPLR article 78 proceeding to annul the determination adjudging him guilty of contempt. By order dated July 17, 1986 (Kunzeman, J.), the petitioner's punishment was stayed pending the determination of this proceeding.

The petitioner would infer that the entire incident was trivial and evanescent. Such a blatant misrepresentation of the underlying circumstances is reprehensible.

A review of the record in the instant case reflects a pattern of abusive, intimidating and insolent behavior none of which was warranted by the trial court or its rulings. As our dissenting colleague aptly puts it (dissenting opn, at 343): "The petitioner's conduct during the course of the underlying criminal trial was insolent, intemperate and abusive. By any definition, it exceeded the bounds of proper advocacy *(see,* Code of

Professional Responsibility DR 7-106 [C] [6]), and should not be condoned". We are satisfied that the petitioner's conduct was so utterly disgraceful and contemptuous of the court that the authority and dignity of Trial Judges would be grievously damaged were we to conclude that a mere scolding for bad taste on his part would be adequate punishment for the type of misconduct established by the record before us.

22 NYCRR 701.2 (a) provides that "[t]he power of the court to punish summarily any contempt committed in its immediate view and presence shall be exercised only in exceptional and necessitous circumstances, as follows: (1) Where the offending conduct disrupts or threatens to disrupt proceedings actually in progress; or (2) where the offending conduct destroys or undermines or tends seriously to destroy or undermine the dignity and authority of the court in a manner and to the extent that it appears unlikely that the court will be able to continue to conduct its normal business in an appropriate way, provided that in either case the court reasonably believes that a prompt summary adjudication of contempt may aid in maintaining or restoring and maintaining proper order and decorum".

It is our conclusion that the record before us presents a case of "exceptional and necessitous circumstances" and that it appeared "unlikely that the court [would] be able to continue to conduct its normal business in an appropriate way" (22 NYCRR 701.2 [a]), unless the court acted promptly and decisively to put an end to the petitioner's grossly disrespectful conduct. As quoted above, 22 NYCRR 701.2 (a) authorizes such summary action by the court where "the court reasonably believes that a prompt summary adjudication of contempt may aid in maintaining or restoring and maintaining proper order and decorum".

It is abundantly clear to us that the petitioner had cast decorum to the winds and that his pattern of behavior, starting at the *Wade* hearing and continuing throughout the trial until finally stopped by the court's contempt finding, was willful in nature and carried out not only for the purpose of undermining the dignity and authority of the court but also with the intent of rendering the court unable to conduct its normal business in an appropriate way. It is also painfully evident from the petitioner's own language, to the effect that the respondent could not be fair and impartial and that the respondent should recuse himself and "send it [the case] to a fair and impartial [judge]", that the purpose of the petitioner's

engaging in merciless personal attacks on the Judge was to provoke him into granting a mistrial, with the stated purpose of having the case transferred to another Judge. Sustained Judge-baiting of the type shown by this record must be dealt with summarily if a Judge is to uphold the dignity and authority of the law.

The record reveals that during the course of the *Wade* hearing the petitioner engaged in lengthy, abrasive and ad hominem attacks addressed to the court and the Assistant District Attorney.

Notwithstanding repeated orders by the court to proceed with the hearing, the petitioner remained intransigent. The court unequivocally warned the petitioner that he would otherwise be held in contempt. Subsequent to the denial of his request for a recess, the petitioner walked out of the courtroom and was adjudged to be in contempt of court. Following a conference in chambers among the Trial Judge, the petitioner, his supervisor, and the prosecutor and his supervisor, the petitioner agreed to continue with the hearing. The petitioner later apologized to the court, whereupon the court indicated that it would not pursue the contempt citation. The court then issued a caveat with regard to the consequences of such disrespectful courtroom conduct. The petitioner's sardonic response evinced no contrition whatsoever.

"THE COURT: Counsel, I had ground, actually, to cite you for contempt for a number of things, and I will not be so generous next time. All I ask you that you conduct yourself as an attorney, as an officer of the court. I ask that of every attorney.

"MR. WERLIN: Excuse me, Judge?

"THE COURT: I ask that of every attorney. I'm entitled to that, and I expect every attorney to do that.

"MR. WERLIN: I will, Judge.

"THE COURT: Respect for the Court at all times.

"MR. WERLIN: Okay. So then I would ask your Honor to conduct this court in the manner consistent with the laws of the State of New York and justice as we all know it. I would ask that of the Court, and I would expect that.

"THE COURT: You don't have to ask that of the Court.

"MR. WERLIN: Well, I would.

"THE COURT: Let's not pursue it any further.

"MR. WERLIN: It's probably a good idea.

"THE COURT: I haven't made a ruling.

"MR. WERLIN: What happened yesterday had nothing to do with your Honor's ruling or any Wade issues.

"THE COURT: All right, counsel, let it go at that".

As the trial proceeded, the petitioner accused the court of being biased against his client, of acting to protect a prosecution witness and "doing a tremendously damaging job in limiting" the defense, of having "left the role of being an impartial arbiter" and of sabotaging the defendant's case. Rather than merely taking exception to adverse rulings, the petitioner saw fit to embark on vituperative tirades against the court's competence. The following excerpts from the record cogently evince the petitioner's disrespectful and disruptive behavior:

"MR. WERLIN: If that's your ruling, and based upon the way you've conducted this trial so far, it's my sincere opinion that it's incapable of getting a fair trial on the law and evidence as I know them, Judge. I don't think your Honor is properly interpreting the law, I don't think your Honor is giving me the scope, I don't think your Honor is being fair and impartial. I would refer back to the show-up in the courtroom where the District Attorney perpetrated—

"THE COURT: Counsel, let's not rehash old things.

"MR. WERLIN: It's all part of a pattern, Judge, and for that reason, Judge, I think you can't give us a fair trial. I think its impossible to get a fair trial in this courtroom. I ask you recuse yourself, Judge, and send this to a trier who can give us a fair trial, and will allow the defendant to have his day in court, unlike what seems to be transpiring in this courtroom today.

"THE COURT: Your application is denied * * *

"MR. WERLIN: Judge, I just wanted to put on the record my extreme objection to recessing the trial at that crucial point. There's no question in my mind it was done knowingly and calculatedly to interrupt my cross-examination at the worst possible time. Your Honor knows I have that document I wanted to introduce into evidence. I mentioned it to the jury. The jury, of course, was very interested in seeing it, and your Honor decided that that was the appropriate time to take a recess. Nothing could have been more improper, nothing could have been more calculated to sabotage the defendant's case. I should say I was shocked at it, but at this time I'm getting used to the kind of behavior from the Court, every one of your

rulings, everything you've done, Judge, is for one objective, that's to help the District Attorney get a conviction in this case. It extends back to last week when you allowed probably the worst perpetration of a fraud I've ever seen in the courtroom, when a witness actually misidentified the defendant in your presence".

At one point in the trial, the court interrupted the petitioner from reading a document not in evidence. This gave rise to the following interchange:

"THE COURT: There's a proper way of doing this. You can ask the question, but you cannot hold this piece of paper which is not in evidence up in front of you and look like you are reading from it when you ask the question. It's a very simple way of doing it. You are too bright a lawyer to know how not to do it.

"MR. WERLIN: Why is everything else being done wrong and you want me to do this right?

"THE COURT: You do everything right.

"MR. WERLIN: Let the record reflect I'm holding a complaint follow-up, the official police report that the District Attorney provided for me, and I'm just looking at it. You want me to put it down after I look at it, I'll do it that way.

"THE COURT: I don't want you to give the jury the impression you are reading from something that's not in evidence. If you persist on [sic] it, you are going to have problem[s] from me.

"MR. WERLIN: I've had problems with you.

"THE COURT: You're going to have problem[s].

"MR. WERLIN: I don't want to misquote it, Judge. It's important to get it right. I'm doing it the right way. Unfortunately, your Honor doesn't see it that way".

On more than one occasion, the petitioner questioned the Trial Judge in the presence of the jury as to whether or not he rather than the witness was testifying. The petitioner's implication that the court was acting improperly was clear. In the presence of the jury, the court warned the petitioner against becoming abusive. This led to the following interchange:

"MR. WERLIN: Your Honor, I think by your attitude you are being very bias[ed] and prejudice[d] in this case, I think you are doing everything to take over the prosecution of this case, you're indicating your extreme displeasure at all my questions, you're doing everything to protect this witness. I think

you can't be fair and impartial. I think you are doing your best to convict this defendant. For that reason, I ask [that] you recuse yourself and send it to a fair and impartial—

"THE COURT: Your motion is denied.

"I'm going to warn you, I will hold you in contempt if you persist in asking questions like that of the Bench, whether I am testifying. You know very well it's improper. You know very well that it's designed to demean me in the eyes of this jury, and I will not permit it, and if you continue it, I will hold you in contempt, fine you $250—

"MR. WERLIN: I'll stand by the—

"THE COURT: (Continuing)—$250 for each and every time you do it.

"MR. WERLIN: I'll stand by the record. I don't think there's anything I could do to demean you in front of this jury".

It bears noting at this juncture that on at least two further occasions the court issued warnings against the petitioner's continued insolence. Notwithstanding these caveats, the petitioner continued to abuse the court's indulgence with such comments as the following: "When I'm doing it my way, you have no right to interfere with me"; "You decide what the D.A. tells you to decide"; "You have no conception of what this trial is about"; and "Every single ruling made by the Bench is dead wrong". Moreover, the petitioner continued to bicker with the court in the presence of the jurors, thereby impairing the court's dignity and authority.

As part of this ongoing scenario, the petitioner delivered the following vitriol after which he was finally adjudged to be in contempt.

"MR. WERLIN: Judge, I have never heard anything [like] the rules being formulated in this courtroom. I take exception to it.

"THE COURT: Counsel, I can live without those comments, and you could too. You just do whatever you have to do in connection with this case. I don't want any comments from you as to how the Court is conducting—

"MR. WERLIN: Judge, You're violating every rule of evidence and right in the Penal Law, in the CPL, you are making up rules I've never heard of. The District Attorney is asking for specious, nonsensical motions, and you see fit to grant them. For a witness to come in after she testified to bolster her own reputation in the community is preposterous.

"The only thing that was done in my case, we talked about reputation in the community through third party. If he has third parties, it might possibly be proper.

"It's unheard of, Judge, it's never been done before. Please don't make new law on this regard. You've made enough bad law on *[sic]* this case, Judge".

The final question to be addressed is whether the provisions of 22 NYCRR 701.2 (c) were satisfied. That rule provides that "[b]efore any summary adjudication of contempt the accused shall be given a reasonable opportunity to make a statement in his defense or in extenuation of his conduct". The purpose of that rule is to enable an accused to give an explanation for his conduct which may result in a finding of no contempt or in reducing the punishment. Although the court did not call for a statement from the petitioner immediately prior to the adjudication of contempt, the spirit and purpose of the rule was certainly fulfilled here. On several occasions before holding the petitioner in contempt, the petitioner was warned and gave his explanation for his misbehavior with remarks like the following: "[Y]ou can't be fair and impartial"; "[Y]ou're doing your best to convict this defendant"; and "I'm getting used to the kind of behavior from the court, every one of your rulings, everything you've done, Judge, is for one objective, that's to help the District Attorney get a conviction in this case. It extends back to last week when you allowed probably the worst perpetration of a fraud I've ever seen in the courtroom". Even at the point when the court announced its finding of contempt, the petitioner was not denied the opportunity to make a statement in his defense or in extenuation of his conduct. In the surrounding colloquy, the petitioner asked the court for the basis of the contempt adjudication. The court responded: "I am sick and tired about your statements about me making bad law and not conducting the trial properly". The petitioner countered with the following remark: "That's my opinion, Judge". He failed to avail himself of the court's offer to purge himself from contempt by paying the fine within a set time. On the contrary, the petitioner adamantly refused to even acknowledge his wrongdoing and requested a copy of the minutes to ascertain whether he had done anything wrong.

Upon our review of the entire record, it cannot be gainsaid that the respondent was justified in holding the petitioner in contempt and that a prompt summary adjudication was neces-

sary *(see,* 22 NYCRR 701.2 [a] [1], [2]). As we said in *Matter of Mangiatordi v Hyman* (106 AD2d 576, *appeal dismissed* 64 NY2d 1040, *lv denied* 65 NY2d 609), "[p]etitioner's conduct and his numerous statements intimating that the court was acting in a biased manner tended both to disrupt the proceedings while they were actually in progress and to seriously destroy or undermine the dignity and authority of the court in a manner and to an extent that it appeared unlikely that the court would be able to conduct its normal business in an appropriate way".

Inasmuch as the court made its determination during the course of the trial rather than at its conclusion, no hearing was required *(see,* 22 NYCRR 701.2, 701.3). The petitioner's claim of surprise is totally belied by the extensive record of warnings and the numerous opportunities afforded him to make a statement in his defense or to alter his conduct *(cf., Matter of Singer v Groh,* 99 AD2d 758). Rather than availing himself of the benefits thereof, the petitioner succeeded only in exacerbating the situation. While the remarks by the petitioner which immediately preceded the adjudication of contempt were not made in the presence of the jury, it is simply incredible that the petitioner, after having received numerous warnings with respect to his behavior, could have believed that the final colloquy was a separate and isolated incident rather than a part of an ongoing scenario. By necessitating incessant side Bar conferences, the petitioner's conduct clearly disrupted the continuity of the trial. His undisguised suggestion that the court was conducting the trial improperly and acting in a biased manner in favor of the prosecution was calculated to reveal to the jurors the petitioner's lack of respect, bordering on utter disdain, for the trial court. To contend that this ongoing pattern of conduct was not such as to impede the progress of the proceedings is to blithely deny the reality of the situation.

In sum, the petitioner's pattern of behavior was willful in nature and carried out with the intent to undermine the dignity and authority of the court in such manner as to render it unable to conduct its normal business in an appropriate way. It is quite clear that the purpose of the petitioner in engaging in this course of conduct was to compel a mistrial, with the stated hope of having the case transferred to another Judge. Such conduct is not to be condoned.

Accordingly, the determination should be confirmed and the proceeding dismissed, on the merits, with costs.

Brown, J. P. (dissenting). The petitioner's conduct during the course of the underlying criminal trial was insolent, intemperate and abusive. By any definition, it exceeded the bounds of proper advocacy *(see,* Code of Professional Responsibility DR 7-106 [C] [6]), and should not be condoned. Nevertheless, I am not prepared to vote to sustain a finding of criminal contempt under the circumstances of this case, for I question both the necessity of the *summary* exercise of the contempt power as a means to discipline the petitioner and the manner in which that extraordinary procedure was employed by the trial court.

Criminal contempt is a crime in every fundamental respect *(see, Bloom v Illinois,* 391 US 194, 201-202), and any criminal contempt adjudication must therefore be carefully examined to determine whether it has been rendered in accordance with basic notions of due process. Courts must be particularly zealous in this regard when the contempt adjudication has been rendered summarily during the course of a trial. While the right of a court to summarily exercise its contempt power has a long history, both at English common law and in this country *(see, Ex parte Terry,* 128 US 289), over the years its use has been criticized on the ground that it is inherently violative of fundamental notions of due process *(see, Green v United States,* 356 US 165, 193-194 [Black, J., dissenting]; *Sacher v United States,* 343 US 1, 20-23 [Black, J., dissenting], *reh denied* 343 US 931; Sedler, *The Summary Contempt Power and the Constitution: The View From Without and Within,* 51 NYU L Rev 34). Accordingly, the circumstances under which a court may summarily hold one in contempt have come under considerable scrutiny and have been narrowed by decisional law *(see, e.g., Taylor v Hayes,* 418 US 488; *Codispoti v Pennsylvania,* 418 US 506 [defining when a contempt charge must be tried before a jury]; *Mayberry v Pennsylvania,* 400 US 455 [when a Trial Judge has become so embroiled in the matter as the target of the contemptuous behavior that he may not preside over the contempt trial]).

Even those cases upholding the summary exercise of the contempt power recognize that summary contempt constitutes a departure from ordinary due process and that summary punishment is to be regarded with disfavor *(see, Sacher v United States, supra,* at 8). Its exercise is justified only by a rule of necessity *(see, Sacher v United States, supra; Cooke v United States,* 267 US 517, 534). Thus, it has been observed that "[s]ummary punishment of contempt is concededly an

exception to the requirement of Due Process * * * Necessity must bound its limits" *(Sacher v United States, supra,* at 36 [Frankfurter, J., dissenting]). When the element of necessity ceases to be a consideration, as when, for example, the court defers ruling upon contemptuous conduct until the conclusion of the trial, then ordinary due process concerns must be satisfied and the contemnor must be afforded notice of the charges and an opportunity to be heard *(see, Taylor v Hayes, supra).* Indeed, this court's own rules reflect the rule of necessity, stating that the exercise of the summary contempt power is to be reserved for use "only in exceptional and necessitous circumstances" (22 NYCRR 701.2 [a]).

I submit that the element of necessity did not exist at the time of the summary contempt adjudication in this case. While the petitioner's conduct, without doubt, tended to "seriously * * * undermine the dignity and authority of the court" (22 NYCRR 701.2 [a]), it cannot be said, in my judgment, that as a result thereof it appeared "unlikely that the court [would] be able to continue to conduct its normal business in an appropriate way" (22 NYCRR 701.2 [a]). The petitioner's purportedly contemptuous statement came at the end of a lengthy exchange with the court, out of the presence of the jury, and did not prevent the trial—which had almost reached its conclusion—from going forward or otherwise destroy the decorum of the courtroom. Absent such an obstruction of the proceedings, there was no immediate need to summarily render the contempt citation. The matter could have been disposed of in a posttrial proceeding at which the full panoply of due process rights would have been available.

While there is no specific standard as to what type of conduct must be involved before a court may resort to the summary contempt power, there are some guidelines which can be gleaned from the cases. The Supreme Court has stated that in order to justify the exercise of the summary contempt power, the conduct involved must amount to an "actual obstruction of justice" *(In re McConnell,* 370 US 230, 236), which brings about an "immediate interruption" of the court's business *(In re Michael,* 326 US 224, 227). Mere disrespect directed to the trial court will not be sufficient to sustain a summary citation for contempt *(see, Offutt v United States,* 348 US 11) and Trial Judges have been cautioned "against confusing offenses to their sensibilities with obstruction to the administration of justice" *(Brown v United States,* 356 US 148, 153, *reh denied* 356 US 948; *see also, In re Little,* 404 US 553;

Annotation, *Attorney's Addressing Allegedly Insulting Remarks to Court During Course of Trial as Contempt,* 68 ALR3d 273).

A review of the record herein fails to reveal how the conduct on which the contempt adjudication was based disrupted or impeded the progress of the proceedings to such an extent that resort to summary adjudication was necessary to maintain or restore order. The adjudication came at the end of an extended colloquy between the court and defense counsel over the propriety of the court's granting an adjournment to allow the prosecution to produce the complainant and reopen the case for purposes of rebuttal. While the petitioner's comments were disrespectful and discourteous in both tone and content, and while they were preceded on numerous occasions during the trial by conduct ill-befitting an officer of the court, they were not made in the jury's presence and did not constitute the type of exceptionally boisterous or disruptive conduct which prevented the trial from continuing and which necessitated the invocation of the summary contempt power. Indeed, the Trial Judge's own comment in response to the petitioner's inquiry as to why he was being held in contempt, to wit, "I am sick and tired about your statements about me making bad law and not conducting the trial properly" was a very clear indication that the court was acting in response to a personal attack rather than out of any need to maintain or restore order in the courtroom. Similarly, the trial court's subsequently issued written order states merely that the petitioner's "behavior directly tended to impair the respect due to its authority" and does not suggest that the court acted out of a need to maintain or restore order. The exercise of the summary contempt power at bar thus appears to fall squarely within those types of situations against which the Supreme Court has cautioned in *Offutt v United States* (348 US 11, *supra), Brown v United States* (356 US 148, *supra),* and *In re Little* (404 US 553, *supra).* While the petitioner's conduct might well have been worthy of a contempt citation, the level of requisite necessity had not been reached so as to justify the trial court's having made that determination summarily. The issue of the petitioner's conduct should have been addressed in a posttrial proceeding in which the petitioner would have been accorded ordinary due process protections *(see,* Judiciary Law §§ 90, 750 *et seq.; see also,* 22 NYCRR 691.2, 691.4, 691.5, 691.6, 701.3).

Moreover, but equally important, even if one were to con-

clude that the petitioner's conduct was sufficiently disruptive to allow for the exercise of the summary contempt power, the record reveals that the Trial Judge failed to afford the petitioner the requisite minimal procedural guarantee of allowing him to make a statement on his own behalf before it passed judgment *(see,* 22 NYCRR 701.2 [c]; *Matter of Rodriguez v Feinberg,* 40 NY2d 994; *Matter of Katz v Murtagh,* 28 NY2d 234; *Matter of Mangiatordi v Hyman,* 106 AD2d 576, *appeal dismissed* 64 NY2d 1040, *lv denied* 65 NY2d 609; *Matter of Singer v Groh,* 99 AD2d 758). It is not a question, as the majority frames it, of whether the petitioner was forewarned to curtail his conduct or whether he was surprised by the court's action. Rather, once the court summarily determined to hold the petitioner in contempt, it was required to give him an "opportunity to make a statement in * * * extenuation of his conduct" (22 NYCRR 701.2 [c]).

The right to personally address the court prior to imposition of a sentence in ordinary criminal proceedings is, of course, well established *(see,* CPL 380.50; *People v McClain,* 35 NY2d 483, *cert denied sub nom. Taylor v New York,* 423 US 852), and such right, which is so basic to our jurisprudence, must similarly not be disregarded in summary criminal contempt proceedings *(see, Taylor v Hayes,* 418 US 488, *supra; Groppi v Leslie,* 404 US 496). In light of the numerous other due process protections which are denied to a contemnor in the case of a summary criminal contempt adjudication, the failure to provide even this minimal protection takes on heightened significance. As the Court of Appeals stated in *Matter of Katz v Murtagh (supra),* "the query whether he had anything to say after being told what the presiding Justice had in mind * * * was the essential proffer in open court of an opportunity to a person, advised that he was in peril of being adjudged in contempt, to offer any reason in law or fact why that judgment should not be pronounced. Indeed, if the court had failed to do just that, the action taken would have been high-handed if not wholly null, given the summary power that was being exercised" *(Matter of Katz v Murtagh, supra,* at 238). At bar, the failure to provide the petitioner with an opportunity to be heard, standing alone, mandates the vacatur of the contempt citation *(see, Matter of Rodriguez v Feinberg, supra).*

In sum then, I conclude that the circumstances herein were not such as to have made it necessary for the Trial Judge to resort to the exceptional remedy of a summary contempt adjudication in order to properly and effectively discipline the

petitioner's conduct; and further, that in attempting to exercise that extraordinary power, the court failed to grant the petitioner even the minimal due process protections which must attend such an adjudication. Accordingly, I vote to grant the petition and annul the determination adjudging the petitioner guilty of criminal contempt.

NIEHOFF, LAWRENCE, WEINSTEIN and RUBIN, JJ., concur; BROWN, J. P., dissents, and votes to grant the petition and annul the determination, with an opinion.

Adjudged that the determination is confirmed, the proceeding is dismissed, on the merits, with costs, and the stay granted by this court in an order dated July 17, 1986, is hereby vacated.