# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

JONATHAN ERNEST MANWELL,

       Defendant-Appellant.

UNPUBLISHED
February 22, 2018

No. 333916
Macomb Circuit Court
LC No. 2015-002139-FC

---

Before: JANSEN, P.J., and SERVITTO and SHAPIRO, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of three counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(b)(*i*) and (*ii*), and two counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(b)(*i*) and (*ii*). The trial court sentenced defendant to concurrent prison terms of 15 to 30 years for each CSC-I conviction, and 10 to 15 years for each CSC-II conviction. We affirm.

## I. FACTS AND PROCEEDINGS

Defendant was convicted of sexually abusing his daughter, DM. Defendant was not involved in DM's life until she was about eight years old. DM grew up with her mother, CM, her stepfather DB, and two siblings who were born to CM and DB. CM reunited with defendant and married him in 2012, after she divorced DB. According to testimony at trial, DM grew emotionally close to defendant after he became a part of her life. Defendant spent time with DM in her bedroom at night, talking with her after she went to bed. DM sometimes urged defendant to stay. CM allegedly resented defendant's exclusive attention to DM. At trial, DM testified that she valued her closeness with defendant, but claimed he sometimes engaged in inappropriate conduct with her. When she was 12 years old, he began having explicit conversations with her about sex. According to DM, when she was 14 years old, defendant sometimes fondled, licked, and kissed her breasts, and also digitally penetrated her vagina. These incidents took place in her bedroom during defendant's nighttime visits, and also in a recreation room in the basement. DM testified that during the years in which the abuse occurred, there were also time periods when defendant did not abuse her.

DM did not disclose the abuse until March 18, 2017. On March 17, DM was the victim of a bullying incident by another girl at school. When defendant learned about the incident that night, he reacted angrily and blamed DM because he believed that DM gave the girl "ammo" to

bully her. Nonetheless, DM asked defendant to stay with her at bedtime. Defendant stayed in her room, and fell asleep in DM's bed. DM testified at trial that she fell asleep and awoke to find that defendant had his hand in her pants and was touching her vaginal area. Later, when CM came for defendant, he spent the rest of the night in the living room, where he and CM slept.

The next morning at school, DM told four of her friends at school that defendant sexually molested her. DM also told two teachers. The school contacted the police and Child Protective Services (CPS). Jennifer Raleigh, a CPS investigator, and Jean Reid, a police officer, interviewed DM at the school. Detective John Newman also later interviewed DM and CM. Defendant also voluntarily agreed to be interviewed by Newman.

Defendant initially accepted a plea agreement to plead no contest to one charge of fourth-degree CSC (CSC-IV), but he later withdrew the plea after stating that he had "found the answer" and "proved it out completely." Defendant was charged with three counts of CSC-I, two counts of CSC-II, and one count of third-degree criminal sexual conduct (CSC-III). A jury convicted defendant of the CSC-I and CSC-II charges, but acquitted him of the CSC-III charge.

## II. HEARSAY

Defendant argues on appeal that six witnesses — two of DM's friends, her teacher, the CPS investigator Raleigh, and the police witnesses Reid and Newman — improperly repeated DM's statements relating the sexual abuse. Defendant argues that this testimony was inadmissible hearsay. Although a trial court's decision to admit or exclude testimony is generally reviewed for an abuse of discretion, *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014), defendant failed to preserve these claims because he did not object to the challenged testimony at trial, MRE 103(a)(1). Therefore, we review this issue for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "On plain error review, the defendant has the burden to show (1) 'error'; (2) that the error was 'plain,' meaning 'clear or obvious'; (3) and that the error affected substantial rights or caused prejudice, meaning 'that the error affected the outcome of the lower court proceedings.' " *People v Lawhorn*, 320 Mich App 194, 197 n 1; ___ NW2d ___ (2017), quoting *Carines*, 460 Mich at 763.

Defendant also argues that defense counsel was ineffective for failing to object to the challenged testimony. Because defendant did not raise a claim of ineffective assistance of counsel in the trial court and no evidentiary hearing was held pursuant to *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973), our review of that claim "is limited to errors apparent on the record." *People v Avant*, 235 Mich App 499, 507; 597 NW2d 864 (1999). "Effective assistance of counsel is presumed, and a defendant bears a heavy burden to prove otherwise." *People v Swain*, 288 Mich App 609, 643; 794 NW2d 92 (2010). To obtain a new trial based on a claim of ineffective assistance counsel, the "defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

We disagree with defendant's argument that the challenged testimony was inadmissible hearsay. Hearsay is defined as "a statement, other than the one made by the declarant while

testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Generally, hearsay is inadmissible. MRE 802. Excluded from the definition of hearsay are prior statements of a witness where "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive . . . ." MRE 801(d)(1)(B).

The defense theory at trial was that DM fabricated the allegations of sexual abuse and told her friends that defendant sexually abused her because she was angry at him because of his reaction to the bullying incident. Her friends then encouraged her to tell a teacher and gave her an ultimatum that they would tell a teacher if she did not, which then led to CPS and the police becoming involved. According to defendant, DM's story "snowballed" as she repeated it to teachers, CPS, and police officers. These authority figures uncritically believed DM's allegations and assured her they would protect her. Defense counsel advanced this theory in opening statement and closing argument, and in his cross-examination of prosecution witnesses. In opening statement, defense counsel stated:

> [T]he story starts evolving. Then she tells. Of course, now she has to tell the counselor. She doesn't know all this happening. You have to tell the counselor. You have to tell CPS worker. Those of you don't, Child Protective Services was brought in any time children are involved.

> And then she has to tell other people through the system. We have a hearing in the case. She appears there for the first time. She used the word finger, my dad fingers me. She never used that word before. Now it has escalated to penetration.

Counsel further stated, "It's just sad and the way our system and everything is. Once you say something all this trickling starts." Defense counsel vigorously cross-examined DM regarding the course of events after she disclosed the abuse to her friends. In his closing argument, defense counsel argued that DM's inconsistent statements were likely caused by other persons influencing her. Counsel stated:

> Another inconsistent about, Ms. Shkreli tried, pressed hard as she could to have Detective Newman say penetration on the 17. There was no, and she indicated there was not, consistently from what I understand, up until later. Then all of a sudden the people are talking to her, talking about the elements of the crime, make it more serious. You start talking about fingering and things like that, so forth, things about that to the point the allegations aren't even, I mean, consistent.

Counsel argued that DM's teacher used her own words, not DM's words, when testifying about DM's disclosure. Defense counsel argued that after DM confided in her friends, the disclosure became a "snowballing incident."

DM's statements to her friends, teacher, Raleigh, Reid, and Newman were relevant to rebut the defense theory, which was based on an alleged disconnect between DM's original

statements and motives and the course of the criminal investigation. In addition, DM's statements were admissible under MRE 801(d)(1)(B) to show that DM's reports were mostly consistent over the course of March 18, 2015, and the following days. Accordingly, defendant has failed to establish that the statements qualify as plain error affecting his substantial rights.

We also reject defendant's related claim that defense counsel was ineffective for failing to object to the various statements. Failing to object to inadmissible hearsay may qualify as an objectively unreasonable error. *People v Shaw*, 315 Mich App 668, 674; 892 NW2d 15 (2016). Conversely, "[f]ailing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) (citation omitted).

In this case, defense counsel pursued a reasonable strategy of arguing that the allegations were a product of DM falsely accusing defendant of abuse because she was angry with him, but without intending to get the police or other authority figures involved, and then unwittingly finding herself in a position of having to defend her false accusations and being unable to retract the accusations as teachers, CPS, and the police became involved. Against this backdrop, defense counsel's failure to object was not objectively unreasonable. "[T]his Court will not second-guess defense counsel's judgment on matters of trial strategy." *People v Benton*, 294 Mich App 191, 203; 817 NW2d 599 (2011). "A failed strategy does not constitute deficient performance." *People v Petri*, 279 Mich App 407, 412; 760 NW2d 882 (2008).

### III. OPINION TESTIMONY BY RALEIGH AND NEWMAN

Defendant next complains that Raleigh and Newman were improperly allowed to testify as experts, despite not being formally qualified as experts pursuant to MRE 702. Because defendant did not object to Raleigh's and Newman's testimony at trial, we review defendant's claims for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763. We review defendant's related claim that defense counsel was ineffective for not objecting to the testimony for "errors apparent on the record." *Avant*, 235 Mich App at 507.

MRE 701 provides:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

MRE 702 provides:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Defendant argues that Raleigh's and Newman's testimony was improper because they lacked the requisite qualifications to testify regarding the characteristics of sexual abuse victims. He cites *People v Kowalski*, 492 Mich 106; 821 NW2d 14 (2012), a case in which the defendant sought to present expert testimony in support of his argument that he was coerced into making a false confession. *Id*. at 111-112. The prosecutor moved to exclude this testimony on the ground that it was not reliable under MRE 702 and *Daubert v Merrill Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993). *Kowalski*, 492 Mich at 113-114. The trial court excluded the testimony as unreliable, and because the "highly questionable" probative value of the testimony was outweighed by the danger of unfair prejudice under MRE 403. *Kowalski*, 492 Mich at 117. Our Supreme Court concluded that the trial court erred in "presum[ing] that the average juror possessed the knowledge to evaluate factors that might lead to a false confession." *Id*. at 128-129. The Court held "that because the claim of a false confession is beyond the common knowledge of the ordinary person, expert testimony about this phenomenon is admissible under MRE 702 when it meets the other requirements of MRE 702." *Id*. at 129. The Court "caution[ed] . . . that like other expert testimony explaining counterintuitive behavior, the admissibility of expert testimony pertaining to false confessions is not without limitations." *Id*. at 129. The expert would not be permitted to "vouch for the veracity of a defendant recanting a confession, or give an opinion as to whether defendant was telling the truth when he made the statements to the police." *Id*. at 129 (citation and quotation marks omitted). However, the Court agreed that one expert's testimony was not admissible because it was not sufficiently reliable under MRE 702 and *Daubert*. *Id*. at 134-138.

Turning to the instant case, we note preliminarily that some of the testimony challenged by defendant was elicited by defense counsel. It was defense counsel who elicited Raleigh's testimony that child victims do not exaggerate or misrepresent the frequency of abuse or what they feel during an assault. A defendant waives appellate review of an issue "to which the aggrieved party contributed by plan or negligence." *People v Gonzalez*, 256 Mich App 212, 224; 663 NW2d 499 (2003) (citation and quotation marks omitted). Accordingly, defendant cannot claim error based on testimony that his own counsel elicited from Raleigh.

*Kowalski* and the general principles of MRE 702 and *Daubert* do not apply to defendant's remaining claims of improper testimony. Raleigh's and Newman's testimony was not based on scientific, technical, or specialized knowledge. In the testimony cited by defendant, Raleigh and Newman indicated that their answers were based on their own experience in interviewing sexual abuse complainants. Their opinions were based on their own perceptions, bringing it within MRE 701.

Defendant argues that if Raleigh and Newman were qualified as experts, their testimony was improper because he did not attack DM credibility on the basis that her behavior was inconsistent with sexual abuse. Defendant relies on *People v Peterson*, 450 Mich 349; 537 NW2d 857 (1995), in which a social worker testified that the victim "showed behavior manifestations that were symptomatic of sexual abuse." *Id*. at 355. A second social worker testified that "the victim's behavior was consistent with children who have been sexually abused." *Id*. A clinical psychologist, who also was the child's foster parent, testified that the child's "symptoms were consistent with those of a sexual abuse victim." *Id*. at 356. The Court concluded that "[w]hen the credibility of the particular victim is attacked by a defendant, we think it is proper to allow an explanation by a qualified expert regarding the consistencies

between the behavior of that victim and other victims of child sexual abuse." *Id*. Applying these principles to the *Peterson* case, the Supreme Court held that the expert witnesses were improperly permitted to vouch for the victim's veracity by stating statistics supporting the rarity of false allegations of sexual abuse. The Court acknowledged that "neither witness stated that the child victim was telling the truth," but stated that

> the risk here goes beyond such a direct reference. Indeed, as we have cautioned before, the jury in these credibility contests is looking "to hang its hat" on the testimony of witnesses it views as impartial. Such references to truthfulness as go beyond that which is allowed under MRE 702. [*Id*. at 376.]

The Court further noted that testimony that the victim's behavior was consistent with the behavior of typical sexual abuse victims was improper because "the defendant never argued that the victim's behavior was inconsistent with that of a typical victim of child sexual abuse . . . ." *Id*. at 376-377. The Court concluded, however, that the erroneous admission of the evidence was harmless "in light of the overwhelming evidence against the defendant." *Id*. at 380-381.

In this case, Raleigh's and Newman's opinion testimony was not offered as expert testimony, but was admissible as lay opinion testimony under MRE 701. Nonetheless, the principles limiting expert testimony regarding typical conduct of sexual abuse victims where the defendant does not argue that the victim's conduct was inconsistent with sexual abuse would seem to also apply to lay opinion testimony under MRE 701. If a witness testifies based on experience that a complainant's behavior is typical of victims, there is a danger that the jury will "'hang its hat' on the testimony of [knowledgeable] witnesses it views as impartial," *Peterson*, 450 Mich at 376, whether the testimony is offered as expert testimony under MRE 702, or lay opinion testimony under MRE 701. Accordingly, we agree that such testimony should be limited to the purpose of rebutting a defendant's attack on the complainant's credibility based on conduct of the complainant that is seemingly inconsistent with the allegations of the defendant's misconduct.

Defendant challenges testimony by Newman that was elicited on redirect examination by the prosecutor. On cross-examination, defense counsel commented that defendant's demeanor and mannerisms in his video interview were similar to DM's demeanor and mannerisms described in her own interview. Defense counsel suggested that it would be inconsistent to infer from defendant's demeanor that he was lying, but infer from DM's similar demeanor that her statements were truthful. The prosecutor responded to this strategy by eliciting Newman's testimony that it was typical for a complainant to avoid eye contact. The prosecutor asked Newman what he inferred, with reference to his experience. Newman's testimony that he inferred from DM's conduct that she was confused and ashamed explained why he interpreted DM's conduct differently from how he interpreted defendant's conduct. Newman's additional statement that DM was reluctant to get "her buddy" into trouble further explains Newman's reaction to DM's conduct. In this context, Newman's testimony cannot be construed as vouching for DM's credibility based on his experience or expertise. On the contrary, Newman's inference that DM felt shame, confusion, and guilt over her betrayal of defendant could be construed as equally consistent with the defense theory that her allegations against defendant were fabricated. DM's statement that defendant was her buddy was not a reference to Newman's experience, but a circumstance specific to DM that explained her demeanor and actions.

Defense counsel had questioned DM about her efforts to spend "dad and daughter time" alone with defendant, and her efforts to persuade defendant to spend time with her when he was watching a movie with the family. He asked:

> And you want the ladies and gentlemen of the jury to believe that you did this while the so-called abuse was going on. He's coming into your room, touching you, where you don't want to be touched. And then you're going the next day –
>
> You do what? You then going to the next say saying: Dad, I want to vent to you. Let's go for a walk.

Defense counsel asked DM if "the tug of war" between her and CM over defendant's attention had been going on until March 18, 2015. On recross-examination, defense counsel asked again if DM and CM vied against each other for defendant's attention. He asked, "In response to questioning [by the prosecutor] you indicated that part of the reason was when he wasn't so-called molesting you in between weeks and he was a fine dad, play catch, take care of you; is that correct?" These lines of questioning were intended to attack DM's credibility with the insinuation that her attachment to defendant was inconsistent with her allegations of sexual abuse. Thus, viewed in context, defendant has failed to establish a plain error affecting his substantial rights with respect to Raleigh's testimony that sexual abuse victims often cling to their abuser.

Regarding defendant's related claim of ineffective assistance of counsel, to the extent that defense counsel elicited some of the challenged testimony, the record discloses that the testimony was elicited as part of a strategy of showing that a complainant's reports of sexual abuse cannot always be taken literally. Counsel also attempted to highlight that the same behavior characteristics that defendant displayed during his police interview, which were used to suggest that defendant was not credible, also applied to DM's behavior during her interviews. Counsel also elicited Raleigh's admission that she was not in a position to tell the jury whether DM's allegations were truthful. These lines of questioning were clearly strategic and defendant has not overcome the presumption of sound strategy. The fact that counsel's strategy may not have been successful does not establish that counsel was ineffective. *Petri*, 279 Mich App at 412.

With respect to testimony elicited by the prosecutor, because there was no improper expert testimony, or improper use of lay opinion testimony, defense counsel was not ineffective for failing to object.

## IV. WITNESSES' TESTIMONY BOLSTERING COMPLAINANT'S CREDIBILITY

Defendant further complains that Raleigh's and Newman's testimony was improperly used to bolster DM's credibility. Again, defendant's failure to object to their testimony or to otherwise raise this issue at trial renders this issue unpreserved, limiting our review to plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763. Our review of defendant's related claim of ineffective assistance of counsel is limited "to errors apparent on the record." *Avant*, 235 Mich App at 507.

Michigan adheres to the "well-established principle" that "it is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial." *People v Douglas*, 496 Mich 557, 583; 852 NW2d 587 (2014), quoting *People v Musser*, 494 Mich 337, 349; 835 NW2d 319 (2013). Raleigh testified that victims commonly cannot keep track of how many times abuse occurs. It was defense counsel, not the prosecutor, who elicited Raleigh's testimony that she never caught a child lying about the feeling of abuse, and that children tend to underestimate, rather than exaggerate, the frequency of abuse. Accordingly, defendant cannot claim error based on this testimony. *Gonzalez*, 256 Mich App at 224.

Raleigh's testimony that DM's demeanor and posture during her interview was typical of victims did not constitute vouching for DM's credibility because Raleigh did not associate DM's demeanor and behavior with credibility. Raleigh's testimony that victims have difficulty quantifying past incidents of sexual abuse, if the abuse occurs more than once or twice, was relevant to whether DM's inability to specify the number of incidents affected her credibility. Raleigh's testimony that abused children often "cling to the abuser" and seek the abuser's attention was relevant to rebut defendant's theory that DM's devotion to defendant was inconsistent with abuse. Raleigh did not, however, testify that these factors established that abuse in fact occurred.

Defendant argues that Raleigh indirectly vouched for DM's credibility when Raleigh testified that her job was to investigate and substantiate reports of sexual abuse. Defendant argues that this testimony allowed the jury to infer that Raleigh had concluded that DM's allegations were truthful, because criminal charges were brought against defendant. In any criminal trial, there is a risk that a jury might believe a defendant is guilty because the police and other persons in an investigatory capacity believe that; otherwise, there would be no trial. The jury is, therefore, given instructions to protect the defendant from this impermissible inference. The trial court instructed the jury on the presumption of innocence. The trial court advised the jury that "[t]he fact that the Defendant is charged with a crime and is on trial is not evidence," and that "the fact that he is charged with more than one crime is not evidence." Jurors are presumed to follow the trial court's instructions. *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). Furthermore, Raleigh conceded on cross-examination by defense counsel that she did not know if DM's allegations were truthful. This testimony dispelled any suggestion that Raleigh's experience as a forensic interviewer enabled her to determine DM's credibility.

Defendant argues that Newman improperly testified that defendant was lying when he denied abusing DM. Defense counsel asked Newman on cross-examination if Newman had found, during his follow-up investigation, "anything that he said to be inconsistent [or] to have been a lie?" Newman replied, "Yes, that he didn't touch his daughter." Defense counsel elicited this testimony by asking Newman an open-ended question whether defendant had said anything that Newman believed to be false. Because defense counsel invited this testimony, he waived any claim of error. *Gonzalez*, 256 Mich App at 224. Defendant also cites Newman's testimony that he inferred from DM's demeanor that she felt ashamed and confused, and that she stated that she did not want to get defendant into trouble because he was her buddy. This testimony did not involve an opinion regarding DM's credibility.

Contrary to defendant's argument, the prosecutor did not argue that DM was credible because Raleigh and Newman had said she was credible. The prosecutor relied on Raleigh's testimony regarding behavior traits of a sexual assault victim to argue that DM's clinginess with defendant was not inconsistent with sexual abuse. This argument was responsive to defendant's attempt to use DM's devotion to defendant to attack her credibility.

In sum, defendant has failed to establish that Raleigh's and Newman's testimony discussed in this issue constituted plain error affecting his substantial rights. Therefore, defendant's related claim of ineffective assistance of counsel also cannot succeed. Failing to raise a meritless objection does not constitute ineffective assistance. *Ericksen*, 288 Mich App at 201.

## V. NEWMAN'S STATEMENTS DURING DEFENDANT'S INTERVIEW

Defendant argues that he was prejudiced by the admission of his video-recorded interview with Newman because Newman's statements during the interview improperly vouched for DM's credibility. Defendant did not object to the admission of the video recording at trial. Therefore, this issue is unpreserved, MRE 103(a)(1), and our review is limited to plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763. Review of defendant's related claim of ineffective assistance of counsel is limited "to errors apparent on the record." *Avant*, 235 Mich App at 507.

Defendant argues that playing the unredacted video recording of his interview with Newman was unfairly prejudicial because Newman made statements vouching for DM's credibility. He relies on our Supreme Court's decision in *Musser*, 494 Mich 337, in which the Court addressed a similar claim. The Court observed that it is well settled in Michigan and other jurisdictions that a witness's opinion on the credibility of another person is inadmissible because such testimony has no probative value. *Id*. at 348-349. The Court framed the issue as "whether the rule barring testimony regarding the credibility of another person excludes out-of-court statements to the same effect that are contained in the recordings or transcripts of an interrogation." *Id*. at 349. The Court stated that "[i]n such a case, the contents of the recording or transcript are *not* automatically admissible," because they trigger evidentiary rules, including the rules on admission of hearsay. *Id*. at 349-350. The prosecutor argued that the detectives' statements were not hearsay because they were offered "solely to provide context for defendant's statements that the prosecution wished to admit as an admission by a party opponent under MRE 801(d)(2)." *Id*. at 350. The Court held that it was "unnecessary to adopt a bright-line rule for the automatic exclusion of out-of-court statements made in the context of an interrogation that comment on another person's credibility because the issue can be adequately addressed by our existing rules of evidence." *Id*. at 353. The Court concluded:

> [W]e hold that where the proponent of the evidence offers an interrogator's out-of-court statements that comment on a person's credibility for the purpose of providing context to a defendant's statements, the interrogator's statements are only admissible to the extent that the proponent of the evidence establishes that the interrogator's statements are relevant to their proffered purpose. See MRE 401. Even if relevant, the interrogator's statements may be excluded under MRE 403 and, upon request, must be restricted to their proper scope under MRE 105.

> Accordingly, to ensure a defendant's right to a fair trial, trial courts "must vigilantly weed out" otherwise inadmissible statements that are not necessary to accomplish their proffered purpose. [*Id*. at 353-354.]

The Court further commented on the application of MRE 403, which requires the trial court to weigh the probative value of evidence against the danger of unfair prejudice. "Consistent with these principles, a trial court must therefore evaluate the probative value of the out-of-court statements in providing context to a defendant's statements and the resulting prejudice to a defendant, before the interrogator's out-of-court statements are presented to the jury." *Id*. at 357. The Court cautioned that "a trial court should be particularly mindful that when a statement is not being offered for the truth of the matter asserted and would otherwise be inadmissible if a witness testified to the same at trial, there is a 'danger that the jury might have difficulty limiting its consideration of the material to [its] proper purpose[]." *Id*. at 357, quoting *Stachowiak v Subczynski*, 411 Mich 459, 465; 307 NW2d 677 (1981). The Court acknowledged that child sexual abuse cases present " 'special considerations' given 'the reliability problems created by children's suggestibility' " which create special concerns that the jury might give undue weight to an investigating officer's out-of-court statement "where the determination of a defendant's guilt or innocence hinges on who the jury determines is more credible—the complainant or the defendant." *Id*. at 357-358, quoting *Peterson*, 450 Mich at 371. The trial court should observe MRE 105, which requires the trial court to grant a party's request that the interrogator's remarks are admissible only to provide context to a defendant's statement. *Musser*, 494 Mich at 358.

The Court in *Musser* held that "the trial court abused its discretion by admitting all the detectives' statements to the jury." *Id*. at 359. The problematic statements were the statements that "kids have a hard time lying about this stuff," and the statements about the harm suffered by the complainant. *Id*. at 360-361. The Court analyzed the effect of the erroneous admission by the standard applicable to "nonconstitutional, preserved evidentiary errors," namely that such errors "are not grounds for reversal unless they undermined the reliability of the verdict." *Id*. at 363. The Court concluded that "they did" because the "assessing witness credibility was the pervasive issue for the jury." *Id*. at 364. The Court also concluded that the trial court's "belated limiting instruction did not cure the error." *Id*. The Court vacated the defendant's convictions and remanded the case to the trial court. *Id*. at 366.

In this case, defendant does not cite any specific statement by Newman in the interview. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Payne*, 285 Mich App 181, 195; 774 NW2d 714 (2009) (citation omitted). However, our review of the recorded interview fails to disclose any statements by Newman comparable to the objectionable statements in *Musser*. During the interview, Newman advised defendant of the nature of the allegations reported by DM and told defendant that DM's accusations were partly corroborated by CM's statements, and defendant's admissions, that defendant and DM had often spent time alone in DM's bedroom. In none of these instances, however, did Newman say anything that could be construed as a declaration that he had determined that DM's accusations were credible. At one point, Newman did state, "I'm trying to figure [this] out because everyone tells me you and your daughter are buddies. Because 18-year-old [sic] girls don't just make up this stuff." But unlike the detectives' statements in *Musser*, this statement was brief and isolated. Moreover, the statement was not directed

-10-

specifically at Newman's impression of DM's credibility. The statement that "girls don't just make up this stuff" suggests that fabrication is unusual but not non-existent. More significantly, Newman never indicated that he or any other persons charged with investigating sexual abuse allegations had any means of determining whether a complainant was credible. Newman's statements in the video were necessary to understanding the course of the interview, and to provide context for understanding defendant's statements and conduct. With the single exception noted above, Newman did not pass judgment on DM's credibility. Accordingly, the probative value of the unredacted video recording was not outweighed by the danger of unfair prejudice. Defendant has not established a plain error affecting his substantial rights.

Defendant also argues that defense counsel was ineffective for failing to move to suppress or partially redact the video recording. As indicated, however, the only possibly objectionable portion involved Newman's statement that "girls don't just make up this stuff." Because this statement was brief and isolated, failing to request redaction was not an objectively unreasonable error. Moreover, there is no reasonable probability that this isolated statement was a decisive factor in the jury's determination of defendant's or DM's credibility. *Trakhtenberg*, 493 Mich at 51.

## VI. PROSECUTORIAL MISCONDUCT

Defendant raises multiple claims of prosecutorial misconduct, none of which were preserved with an appropriate objection at trial. *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). "The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial." *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008). "The defendant bears the burden of demonstrating that such an error resulted in a miscarriage of justice." *Id*. "[A]llegations of prosecutorial misconduct are considered on a case-by-case basis, and the reviewing court must consider the prosecutor's remarks in context." *Bennett*, 290 Mich App at 475. "Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting substantial rights." *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011).

### A. VOUCHING FOR DM'S CREDIBILITY

Defendant does not identify specific statements by the prosecutor in support of this claim of error. He instead paraphrases the prosecutor's arguments, but his characterizations of the prosecutor's statements are inaccurate. Defendant asserts that the prosecutor "told the jury that DM had no reason to lie" in her opening statement. The prosecutor actually stated:

> During the course of the trial I encourage you to think about whether or not [DM] has a motive to lie. Was she being disciplined? Did she want dad out of the house?

> I don't think the evidence is going to suggest that. I think the evidence is going to suggest the opposite. That [DM] loves her dad, wants the bond with him, doesn't even want him to get into trouble.

Defendant's argument fails to consider the context of the prosecutor's statements. Defendant asserts that the prosecutor stated in closing argument that DM was telling the truth, that DM was "very credible," that DM had no reason to lie, and that defendant was "a liar and a weirdo." In

closing argument, the prosecutor addressed defendant's theory that DM fabricated the allegations out of resentment that her parents had disciplined her for conduct occurring several months before March 18, 2015. The prosecutor stated:

> Does [DM] seem that sophisticated? Does she seem like she is a puppet master? She had all the, everybody in trouble, lose somebody who is absent her whole life? Somebody that she loved? Someone she clung to?
>
> No. It does not make sense. It does not hold water because it is not true.
>
> What is true is what [DM] tells you.

"Although a prosecutor may not argue a fact to the jury that is not supported by evidence, a prosecutor is free to argue the evidence and any reasonable inferences that may arise from the evidence." *People v Callon*, 256 Mich App 312, 330; 662 NW2d 501 (2003). Prosecutors "should not . . . express their personal opinion of a defendant's guilt, and must refrain from denigrating a defendant with intemperate and prejudicial remarks." *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). A prosecutor "may not vouch for the credibility of his witnesses by implying that he has some specialized knowledge of their truthfulness. But a prosecutor may comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes." *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004) (citation omitted).

The prosecutor's statements came within the parameters of permissible argument. The prosecutor did not suggest that she had any special knowledge, unknown to the jury, that DM was credible. Instead, she argued that the totality of the evidence supported a finding that DM was credible, because she had no motive to lie or to end her relationship with defendant. The prosecutor also argued that defendant unreasonably suggested that DM had planned a scenario in which her false accusations would lead to criminal proceedings and child protective proceedings. This argument appears to misapprehend the defense theory. Defendant was not attempting to argue that DM had planned anything, but instead that she had made false accusations to her friends without realizing the consequences that would follow. The salient point, however, is that the prosecutor's argument did not suggest that she had any special knowledge of DM's credibility.

Defendant argues that the prosecutor unfairly denigrated him by stating that he was "a weirdo" and "weird or creepy." Viewed in context, these pejoratives referred to defendant's seemingly bizarre exhibition on the witness stand and in the police video. They were not random insults aimed at distracting the jury from the evidence. In any event, the prosecutor did not argue that the jury should find defendant guilty because he was weird, but rather because the evidence supported his guilt.

Defendant also states that the prosecutor improperly asked him on cross-examination if he knew that a victim of sexual abuse was more likely to become a perpetrator of sexual abuse. This occurred when the prosecutor questioned defendant about his belief that a gynecologist had examined DM when she was 14 years old and found that she had not been sexually abused. The

-12-

prosecutor asked defendant if he was a trained nurse. Defendant replied that he was not. The prosecutor then questioned defendant as follows:

> *Q*. So you have never been trained in what sexual abuse looks like or feels like?
>
> *A*. I know exactly what sexual abuse feels and looks like. Thank you.
>
> *Q*. How do you know that?
>
> *A*. Because I was.
>
> *Q*. Is that why you did it to [DM]?
>
> *A*. That is why I would never do that to any child ever.
>
> *Q*. You know, it's more common when someone has been sexual[ly] assaulted?
>
> *A*. That is not, that is –
>
> I don't understand that. I am not even saying –
>
> *Q*. Let's go back to the nurse question.

"[P]rosecutorial misconduct cannot be predicated on good-faith efforts to admit evidence." *People v Noble*, 238 Mich App 647, 660; 608 NW2d 123 (1999). Defendant does not explain why the prosecutor's question was improper. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *Payne*, 285 Mich App at 195 (citation omitted). In any event, the prosecutor asked the question as a follow up to defendant's unanticipated statement that he had been sexually abused. Defendant expressed confusion at the question and did not answer it. The prosecutor effectively withdrew the question. To the extent the question was improper, it did not affect defendant's substantial rights because the prosecutor did not pursue an answer.

## B. APPEALS TO SYMPATHY AND CIVIC DUTY

Defendant argues that the prosecutor improperly encouraged the jury to convict him based on sympathy for the victim and a civic duty to protect the community. He cites statements from the prosecutor's opening statement, in which the prosecutor suggested that DM was too young and innocent to have realized when the abuse began because she did not initially understand that defendant's conduct was sexually abusive. Defendant also refers to the prosecutor's statements that she was proud of DM because DM "spoke her freedom" despite losing her family. In addition, defendant refers to the prosecutor's statement suggesting that defendant covered his face during his video-recorded interview because he felt shame and guilt for harming DM. The prosecutor stated:

He feels shame. He feels guilt as he should because [DM] is the way she is, not because she was bullied, not because she struggles with the sexuality. Him abusing her could be a reason as to why [DM] is the way she is. [DM] is alone. [DM] is lost. [DM] is medicated because of the Defendant. She has no one. She has you. And I hope that you're going to be there for her. I hope that you convict him as charged, thank you.

A prosecutor is generally given "great latitude regarding his or her arguments and conduct at trial." *People v Fyda*, 288 Mich App 446, 461; 793 NW2d 712 (2010). "[P]rosecutors may use 'hard language' when it is supported by evidence and are not required to phrase arguments in the blandest of all possible terms." *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996). "Emotional language may be used during closing argument and is an important weapon in counsel's forensic arsenal." *Id*. at 679 (citation omitted). But "[a] prosecutor may not appeal to the jury to sympathize with the victim. . . . Nor may a prosecutor urge the jury to convict as part of its civic duty or on the basis of its prejudices." *Unger*, 278 Mich App at 237. However, improper remarks may be harmless where the comments "were relatively brief and did not likely deflect the jury's attention from the evidence presented in this case." *Id*.

Defendant compares the prosecutor's statements to statements found to be unfairly prejudicial in *People v Dalessandro*, 165 Mich App 569; 419 NW2d 609 (1988). In *Dalessandro*, the defendant was convicted of assault with intent to do great bodily harm less than murder and child torture arising from physical abuse of his girlfriend's infant son. The child presented in the emergency room with numerous injuries, including bruises and fractures in various states of healing, and a three-inch laceration on his leg. The child was malnourished and underweight. *Id*. at 571-572. The improper comments included the statements "Look at the pictures of this little innocent baby. Look at the terror on his face, the sadness in those eyes" and "[The child's] injuries . . . are revolting . . . [and] sickening. They shouldn't happen to a dog, let alone a ten month old baby." *Id*. at 580-581. The prosecutor referred to the victim as a "pitiful little ten month old child" and an "innocent little baby [who] was crying out in pain." *Id*. at 581. Although the defendant did not object to the statements, this Court concluded that failure to address the issue would constitute a miscarriage of justice, and that the improper statements warranted a new trial. *Id*. at 578-579.

In *People v Swartz*, 171 Mich App 364; 429 NW2d 905 (1988), the defendant sexually assaulted a corrections officer at the prison where he was incarcerated. The prosecutor described the case to be "as serious a case as you will ever see or ever hear," and remarked that "there was something taken from this woman that will never be returned, and it was taken at knife point." The jury was urged not to forget during deliberations that "[s]he had to come here on the last two days and bare her soul to you." The prosecutor stated that although he and the jury could "walk out of here today and leave this behind us," the assault was "something [the victim] is going to carry forever." *Id*. at 372. This Court held that these statements "appear to be improper appeals to the jury for sympathy," but concluded that they were "not . . . grounds for a new trial because their prejudicial effect could have been cured with a timely requested cautionary instruction." *Id*. at 372-373.

Defendant was charged with sexually abusing his own daughter. DM showed conspicuous signs of emotional stress during her testimony. The prosecutor could not realistically present evidence and argue her case in an entirely neutral and detached manner, nor was she required to pretend the subject matter was as prosaic as a parking violation. *Ullah*, 216 Mich App at 678. Given these circumstances, the prosecutor's opening remarks describing DM as a "young, innocent girl" were mildly emotional, but markedly less so than the references to the "pitiful little ten month old child" and "innocent little baby [who] was crying out in pain" in *Dalessandro*, 165 Mich App 569. The prosecutor's suggestion that DM was too naïve to recognize the impropriety of defendant's conduct was a reasonable comment in view of defendant's alleged conduct and the family's history. Similarly, the prosecutor's comment that she was proud of DM for confronting defendant's abuse, even at the cost of losing her family, was not immoderate.

The prosecutor's statements that DM was "the way she is" because of defendant's abuse, and not because of other unfortunate circumstances in DM's life, were properly focused on the evidence and the defense theory. Defendant attempted throughout the trial to undermine DM's testimony by insinuating that she was emotionally disturbed, confused about her sexuality, tormented by bullies, and traumatized by abuse from her stepfather. The prosecutor's statement that defendant's abuse caused DM's difficulties was rationally and fairly related to responding to this defense strategy. The statements "DM is alone" and "DM is lost," followed by the prosecutor's entreaty to "be there" for DM, arguably could be construed as an improper appeal to sympathy. But, the prosecutor's argument did not resort to the type of gratuitous rhetoric demonstrated in *Dalessandro*, and the balance of the prosecutor's argument focused on the evidence and why the jury should give credence to DM's testimony. Accordingly, any perceived prejudice could have been cured if defendant had raised a timely objection. Even without an objection, the trial court instructed the jury that it "must not let sympathy or prejudice influence your decision." Under the circumstances, this instruction was sufficient to protect defendant's substantial rights.

## C. SHIFTING THE BURDEN OF PROOF

Defendant argues that the prosecutor improperly shifted the burden of proof to defendant in her cross-examination and closing argument. "A prosecutor may not imply in closing argument that the defendant must prove something or present a reasonable explanation for damaging evidence because such an argument tends to shift the burden of proof." *Fyda*, 288 Mich App at 463-464. "However, where a defendant testifies at trial or advances, either explicitly or implicitly, an alternate theory of the case that, if true, would exonerate the defendant, comment on the validity of the alternate theory cannot be said to shift the burden of proving innocence to the defendant." *People v Fields*, 450 Mich 94, 115; 538 NW2d 356 (1995).

Defendant cites a line of questioning in which the prosecutor cross-examined him about his statements in his interview with Newman suggesting DM's reasons to lie. "[P]rosecutorial misconduct cannot be predicated on good-faith efforts to admit evidence." *Noble*, 238 Mich App at 660. Whether this issue is viewed as a claim of evidentiary error or prosecutorial misconduct, the prosecutor did not attempt to shift the burden of proof to defendant. Defendant's theory of defense was that DM fabricated the allegations. The prosecutor was entitled to explore the factual basis for that theory. The prosecutor did not ask defendant to explain why DM would lie.

A defendant is entitled to protection against compelled self-incrimination and thus may choose not to testify. *People v Clary*, 494 Mich 260, 278-279; 833 NW2d 308 (2013); *Fields*, 450 Mich at 108. However, if a defendant elects to waive his Fifth Amendment rights and testify, "[h]e cannot reasonably claim that the Fifth Amendment gives him not only this choice but . . . an immunity from cross-examination on the matters he has himself put in dispute." *Fields*, 450 Mich at 109, quoting *Brown v United States*, 356 US 148, 155-156; 78 S Ct 622; 2 L Ed 2d 589 (1958).

Defendant also claims improper shifting of the burden of proof during the prosecutor's closing argument. Having reviewed the challenged remarks, we conclude that the prosecutor permissibly addressed defendant's attempt to advance the theory that DM falsely accused defendant of sexual abuse because she resented being disciplined for her misconduct. *Fields*, 150 Mich App at 115. The challenged remarks did not shift the burden of proof.

D. ASKING WITNESSES TO COMMENT ON OTHER WITNESSES' CREDIBILITY

Michigan adheres to the "well-established principle" that "it is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial." *Douglas*, 496 Mich at 583. Defendant argues that the prosecutor improperly asked CM to assess defendant's and DM's credibility. He cites the following portions of the prosecutor's examination of CM regarding DM's testimony that CM chose to support defendant rather than DM:

> *Q*. You do have a relationship with the Defendant?
>
> *A*. Yes.
>
> *Q*. You don't have a relationship with your daughter?
>
> *A*. I'm not allowed to see my daughter right now. They are to –
>
> *Q*. You are saying you would?
>
> *A*. Yes, I would.
>
> *Q*. So the statement that your daughter makes that you're siding with the Defendant over her, would be more true than it is false?
>
> *A*. I'm in a tight situation.
>
> *Q*. You would say you're neutral in this situation?
>
> *A*. Yes.
>
> *Q*. You don't have any say of it one way or the other?
>
> *A*. I don't know how to answer that.
>
> *Q*. Okay. Why do you think [DM] would say you are siding with him?

-16-

*A.* I don't know.  I haven't talked to my daughter in a year.

* * *

*Q.* During the pendency of this whole trial have you been talking to the Defendant.

*A.* Yes.

*Q.* And have you told him that we're going to get through it and I love you?

*A.* Yes.

*Q.* You have said that to him.  So you are then taking his side?

*A.* No, I'm not taking anybody's side.

*Q.* Okay.  When you say:  Honey, we'll get through this.  In talking to the Defendant, that means we'll get through this against [DM].  Isn't that a fair assessment?

*A.* The truth will come out.

*Q.* The truth will come out.  What is the truth?

*A.* I don't know the truth.

These questions were not aimed at eliciting CM's opinion of defendant's or DM's credibility. The clear purpose of these questions was to probe CM's bias and CM's motivations for her testimony.  CM was a significant witness, because she was present in the home during some of the occasions when defendant allegedly abused DM, including the night of March 17, 2015, the incident that triggered DM's decision to disclose the abuse.  CM's testimony was also significant because she had ample opportunity to observe defendant and DM's relationship.  Although some of these questions implicated CM's beliefs regarding DM's allegations against defendant, none of these questions asked CM to comment on whether any other witness was credible.

The prosecutor questioned defendant about consistencies in CM's and DM's testimony regarding DM's sleeping position on March 17.  These questions, like the questions to CM, did not elicit defendant's opinion of DM's or CM's credibility.  They addressed similarities and differences among these three witnesses' testimony.  Defendant, having opted to testify, opened himself to cross-examination.  Defendant, CM, and DM all testified in specific detail regarding the events of March 17, 2015.  Questioning defendant about the consistencies and inconsistencies between their testimony does not equate asking defendant to comment on any witness's credibility.

In sum, defendant has failed to establish his claims of prosecutorial misconduct. Accordingly, his related claims that defense counsel was ineffective for failing to object to the

prosecutor's conduct also cannot succeed. Counsel is not required to make a futile objection. *Ericksen*, 288 Mich App at 201.

## VII. DEFENDANT'S STANDARD 4 BRIEF

Defendant has filed a pro se supplemental brief, filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4, in which he provides a lengthy and detailed discussion of the events beginning with March 18, 2015, when DM disclosed the abuse to her friends and teachers. Most of the discussion refers to facts never introduced as evidence in this case. Essentially, defendant maintains that CPS social workers, the foster care worker, CM's ex-husband DB, and other members of CM's family, all conspired to frame defendant for abuse actually committed by DB. Defendant maintains that a report by a neuropsychologist, Dr. Ryan, was completed in the spring of 2015, but concealed from the court because Dr. Ryan found that DB, not defendant, was the perpetrator of abuse. Defendant accuses the prosecutors of concealing evidence of DM's gynecological examination when she was 14 years old because the exam report exonerated him. He states that Raleigh and Newman falsely denied that DM was not brought for a medical examination after she disclosed the sexual abuse, and that they failed to disclose the report of the actual examination because it was exculpatory. Defendant asserts that DM told Dr. Ryan that her "dad" committed the abuse, but she was referring to DB, not defendant. Defendant opines that DM's medication and therapy caused her to blur DB and defendant "into one paradoxical, seemingly singular persona Dr. Ryan referred to as a 'phenomenon.' "

From the morass of statements in defendant's Standard 4 brief, none of which are supported by evidence in the lower court record, we can discern one cogent argument, namely, that the prosecution suppressed forensic reports and other evidence that would have exonerated defendant, in violation of *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). Due process claims, including claims of *Brady* violations, are reviewed de novo on appeal. *People v Dimambro*, 318 Mich App 204, 212; 897 NW2d 233 (2016). But, unpreserved claims of constitutional error are reviewed under the plain-error standard. *People v Shafier*, 483 Mich 205, 211; 768 NW2d 305 (2009).

"The Supreme Court of the United States held in *Brady* that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *People v Chenault*, 495 Mich 142, 149; 845 NW2d 731 (2014). To establish a *Brady* violation, a defendant must prove: (1) that the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) viewed in its totality, the evidence is material. *Chenault*, 495 Mich at 149. In this case, there is no record evidence that the prosecution was in possession of the neuropsychologist's report or the other materials that defendant refers to in his Standard 4 brief. In addition, there is no record evidence to prove the contents of the allegedly suppressed reports. Consequently, defendant cannot establish a plain error affecting his substantial rights. *Shafier*, 483 Mich at 211.

Defendant further asserts that the Warren Police Department, Newman, Raleigh, and even his own counsel suppressed the allegedly exculpatory forensic reports. Again, however, defendant has not established any factual support for these claims. Defendant further argues that

trial counsel was ineffective for refusing to present a defense based on the theory that DM was manipulated into accusing defendant of abuse committed by DB, and that others had conspired to frame defendant for DB's conduct. Because defendant has not demonstrated any factual support for this theory of defense, there is no basis for finding that trial counsel committed an objectively unreasonable error by failing to pursue it, or that there is a reasonable probability that the outcome of defendant's trial would have been different if counsel had attempted to advance defendant's conspiracy defense. *Trakhtenberg*, 493 Mich at 51.

Affirmed.

/s/ Kathleen Jansen
/s/ Deborah A. Servitto
/s/ Douglas B. Shapiro